BIOTHERMAL PROCESS CORPORATION, Appellant-Respondent, v. COHU & COMPANY, Respondent-Appellant.

First Department, November 24, 1953.

*Leo T. Kissam* of counsel (*James H. Halpin* and *Joseph M. O'Loughlin* with him on the brief; *Leo T. Kissam,* attorney), for respondent-appellant.

*Arthur P. McNulty* for appellant-respondent.

Dore, J. Plaintiff, a New York corporation, sued defendant, a New York investment banking firm, to recover $4,000,000 alleged damages for defendant's breach of a contract claimed to have been made by defendant to finance plaintiff in building and operating a so-called biothermal garbage disposal plant in the city of Miami, Florida, through another corporation, the Florida-Caribbean Biothermal Process Inc., called a subsidiary of plaintiff but actually owned by plaintiff's stockholders. After trial before the court and a jury, defendant appeals from those parts of an order of the trial court which denied defendant's motions to set aside the jury's verdict of $560,000 in plaintiff's favor, for a directed verdict and to dismiss the complaint; plaintiff appeals from that part of the order which set aside the jury's verdict in plaintiff's favor; and both sides appeal from the court's direction of a new trial on the issue of damages only. Plaintiff asks reinstatement of the jury's verdict; defendant, dismissal of plaintiff's complaint.

The proposed garbage disposal plant was to use a so-called Verdier process, the object of which is to expedite conversion of city garbage into " humus " to be sold to farmers and others as fertilizer. Concededly on October 19, 1949, the City of Miami and the Florida-Caribbean Corporation made a written contract under the terms of which the city was to pay that corporation a fee for operating a biothermal garbage disposal plant for at least fifteen years; and, in addition, that corporation (to the rights of which plaintiff succeeded) was to have the right to sell for its own account all the so-called " humus " the enterprise hoped to produce from the converted garbage.

That contract, however, was subject to an express condition that the Supreme Court of Florida should render a decision holding that the contract was valid, and also specifically determining (1) that Miami City's obligations under the contract need not be ratified at an election of qualified electors; (2) that the city's obligations under the contract were not to be included in the computation of the city's indebtedness under any debt limitation; and (3) that all of the covenants and obligations of the contract were valid and binding. Concededly no such validation by the Florida Supreme Court was ever sought or procured.

In August, 1949, defendant was asked to write a letter to be shown to officials of the City of Miami to indicate what defendant termed its interest and what the Florida corporation termed its promise in the garbage conversion venture, and defendant delivered to counsel in Miami, representing plaintiff or its interests, a letter dated August 11, 1949, confirming that upon the working out of the details of the contract with Miami City, defendant was prepared '' to raise and to make available '' the amounts necessary for the construction of the plant and to provide initial working capital '' up to $2,600,000, through the issuance of obligations and or stock '' of the company or its subsidiary; but the letter also expressly stated that on receipt of confirmation, defendant was to proceed in co-operation with plaintiff in '' the working out of the necessary detailed arrangements and agreements covering among other things, customary commissions or spread to us, expenses, appropriate provision as to compliance with any applicable laws affecting the sale of the securities to be issued, legal approvals, and other mutually satisfactory conditions and provisions customary in underwriting agreements.''

Plaintiff and its Florida '' subsidiary '' were without assets, had never done any business in garbage disposal, biothermal or otherwise, and indeed had never been engaged in any business whatever. Plaintiff's objective and that of Dr. Ruskin and his wife, the original entrepreneurs in the enterprise (who had no interest therein at the trial) was to promote on a large scale a biothermal garbage disposal plant at Miami through a process that was untried and practically unknown in the United States. Defendant is a small but apparently well-known investment house with capital of less than half a million dollars. Under plaintiff's contention, defendant definitively committed and bound itself to furnish the venture capital for this untried enterprise.

The trial court submitted to the jury three questions in writing, the substance of which is as follows:

1. Did plaintiff and defendant enter into an actual agreement that defendant was to make the money available?
2. On what specific term did the parties fail to agree?
3. What damages resulted?

The court submitted to the jury consideration of whether the parties specifically agreed or failed to agree on a number of items; e.g., customary commissions or " spread " to defendant, expenses, compliance with laws and legal approvals and other provisions " customary in underwriting agreements."

The jury answered, ten to two, the first question in the affirmative; it did not answer the second question at all; and in answer to the third found " by unanimous vote " damages in plaintiff's favor of $560,000. After some obvious confusion on the jury's part, on return of the final verdict, defendant moved to set the verdict aside and renewed its motion for a directed verdict. Thereafter, the court rendered an opinion in which it denied defendant's motion for a directed verdict, and to dismiss the complaint, allowed the jury's answer to the first question to stand, but set aside the jury's verdict for $560,000 in plaintiff's favor basically on the grounds that there was no evidence as to the actual nature of Miami's garbage, no evidence as to the amount of humus the operation of the Miami plant would produce; and hence no basis for any finding of any sum in damages proved with reasonable certainty; the court then directed a new trial but solely on the issue of damages.

In his opinion the learned trial court held as a matter of law that defendant's letter of August 11, 1949, expressed a binding obligation or legal commitment by defendant to finance the project. We think that conclusion cannot be sustained either under the pleadings, the proof and plaintiff's own contentions at the trial, or the law of the case. In its bill of particulars, in answer to defendant's demand as to the date when the parties finally worked out the necessary agreements referred to in the letter of August 11, 1949, plaintiff answered "On or about October 18th, 1949 "; and also declared in the same bill of particulars that the " arrangements and agreements entered into between the parties hereto were oral." In the course of the trial, plaintiff's counsel expressly admitted that the alleged agreement plaintiff relied on was " oral ". Plaintiff's own documents written subsequent to the date of August 11, 1949, showed by undenied written admissions that

plaintiff conceded the financial arrangements had not been worked out and agreed upon by August 11, 1949. Plaintiff moved to conform the pleadings to the proof, but the court properly denied that motion. Obviously the letter of August 11, 1949, did not fix the nature or the extent of financing to be furnished by defendant with the definitiveness and certainty necessary to constitute a binding agreement, nor did it fix with certainty the terms on which the financing was to be furnished (*United Press* v. *New York Press Co.*, 35 App. Div. 444, 446, affd. 164 N. Y. 406, 409–410). The elements essential to the proposed financial agreement are absent and left in the realm of conjecture and uncertainty. In the state of facts here disclosed, the cases cited by the learned trial court are not controlling.

We cannot subscribe to the view expressed by the learned trial court that the letter of August 11, 1949, may be taken as an agreement to raise money regardless of the means or medium, and that the form of the financing here was merely incidental or implemental to corporate financing. The ways and means are and in this case were expressly made an integral part of any plan, and it was of the utmost importance here and would make a tremendous difference whether the project was to be financed by common stock, preferred stock or bonds. Without any definitive agreement as to the kind or amount of securities to be issued, and indeed the division and use of the common stocks or equity interest in the company, there could not be said to be even a sketch of a binding contract. On this record, we hold as a matter of law that the letter of August 11, 1949, was not a binding commitment.

The oral agreement on which plaintiff relies claimed to have been concluded on or about October 18, 1949, of its nature had to be a definitive agreement with regard to terms and conditions of financing by an investment banker running into millions of dollars, involving numerous necessary details as to commissions, expenses, legal approvals and other numerous provisions customarily found in underwriting agreements. It is the very type of agreement that normally could not have been made definitive and binding merely by oral talks. The chief testimony of the claimed oral agreement and all its complicated detail were furnished by the then lawyer for plaintiff who claimed it was concluded on October 18, 1949, and confirmed by a telephone communication of October 19, 1949. But by later written documents drawn by the same attorney or his firm and prepared at the times in question on plaintiff's

behalf, long after the claimed oral agreement is supposed to have been fully completed, a specific rider was to be added to a proposed Miami construction contract to the effect that it was to be of no force or effect " unless and until the Owner [plaintiff] obtains binding and enforceable commitments from responsible financing concerns for the furnishing of sufficient finance "; and in a proposed contract between the owner (plaintiff) and a proposed contractor (Gooch & Company) drawn by plaintiff's attorney or his firm after November 3, 1949, there is expressly added as a rider the condition that the agreement is to be of no force and effect " until the Owner obtains binding and enforceable commitments from responsible financing sources ".

Furthermore, the memorandum of October 20, 1949, which belatedly became the principal reliance of plaintiff as a memo or basis on which the oral agreement is claimed to have been reached, makes it clear that the outline is only a " proposed " plan submitted for " consideration "; it repeatedly refers to what is " proposed " and " suggested " and expressly specifies the necessity of " sufficient conferences before any definite decisions are taken."

The finding of the jury (ten to two) in answer to the first question, namely, was there an " actual agreement " is against the overwhelming weight of the evidence and contrary to the evidence. In this record there is no rational basis for a finding that the parties departed from all that is customary or expected in corporate underwritings and made a definitive agreement by parol; and it is so clear that no jury would be warranted in making such a finding that there is no occasion for retrial.

Plaintiff's chief witness for this claimed " oral " agreement himself testified as to his authority to make the agreement on behalf of plaintiff or its representatives then controlled by one Dr. Ruskin and his wife, and also claimed the Ruskins confirmed this to defendant's representatives. But the Ruskins were not called and no excuse was offered for their failure to be present at the trial although they were the most important persons in the preliminary efforts to make some sort of arrangement for financing the project. The record further discloses that one Roberts, at the time of trial president of both plaintiff and the Florida corporation and owner of their controlling stock interests, acquired his stock from the Ruskins on December 26 and 27, 1949, for $25,000; and that this litigation was instituted shortly after Roberts bought control.

On the issue of damages, the trial court properly found that when charges for interest and amortization were deducted, the operation of the proposed plant even on plaintiff's own evidence would result in a substantial annual operating deficit. We think, too, that the proof in this case wholly lacks the standard of reasonable certainty required to establish damages for loss of claimed future profits in the sale of the so-called humus, sales price alone being no basis for computing profits without evidence of the cost of selling (*25 Fifth Ave. Management Co.* v. *Ivor B. Clark, Inc.*, 280 App. Div. 205, affd. 304 N. Y. 808; *Alexander's Dept. Stores* v. *Ohrbach's, Inc.*, 269 App. Div. 321, 329). But in view of our determination that the complaint should be dismissed on the basic ground that plaintiff failed to establish a contract binding on defendant, it is unnecessary to discuss in detail plaintiff's failure to prove damages, or the lack of court validation of the Miami contract.

For the reasons stated we think plaintiff's claims are devoid of merit.

On plaintiff's appeal from so much of the order which granted defendant's motion to set aside the jury verdict with respect to the jury's answer to question No. 3, the order appealed from should be affirmed, with costs to defendant; on defendant's cross appeal from so much of the order which denies defendant's motions to set aside the jury's verdict with respect to the answer to question No. 1 and to direct a verdict in defendant's favor and dismiss the complaint and which orders a new trial on the question of damages only, the order appealed from should be reversed, and defendant's motions in all respects granted and the complaint dismissed, with costs to appellant.

Peck, P. J., Cohn, Callahan and Botein, JJ., concur.

On plaintiff's appeal from so much of the order which granted defendant's motion to set aside the jury verdict with respect to the jury's answer to question No. 3, the order appealed from is unanimously affirmed, with costs to defendant; on defendant's cross appeal from so much of the order which denies defendant's motions to set aside the jury's verdict with respect to the answer to question No. 1 and to direct a verdict in defendant's favor and dismiss the complaint and which orders a new trial on the question of damages only, the order appealed from is unanimously reversed, and defendant's motions in all respects granted and the complaint dismissed, with costs to the appellant. Settle order on notice.