T. A. PIPKIN, D. J. DUDLEY, P. M. WILLIAMS, AND MACK DONALD WEEKS, INDIVIDUALLY AND TRADING AS P. W. D. & W. A NORTH CAROLINA GENERAL PARTNERSHIP v. THOMAS & HILL, INC.

No. 7610SC891

(Filed 3 August 1977)

1. Principal and Agent § 5— scope of apparent authority

The scope of an agent's apparent authority is determined not by the agent's own representations but by the manifestations of authority which the principal accords to him.

2. Principal and Agent § 5— apparent authority — contract binding on principal

An agent with apparent authority can bind his principal to a contract if the other party to the contract does not know that the agent's actual authority is less than his apparent authority.

Pipkin v. Thomas & Hill, Inc.

**3. Principal and Agent § 5— apparent authority of agent to bind principal to make loan**

Defendant mortgage broker's agent had apparent authority to bind defendant to a contract to make a permanent loan to plaintiffs for a motel construction project where the agent was the assistant vice president of defendant and the manager of defendant's North Carolina office; defendant's letterhead and business cards indicated defendant was in the business of making business loans; the loan application form used by defendant did not show that defendant limited its service to that of a broker but indicated that defendant was committed to making a loan once it accepted the application in writing; and the agent was authorized to execute these loan applications.

**4. Contracts § 27.1— contract to make permanent loan**

The evidence supported the court's finding that defendant entered a contract to lend plaintiffs $1,162,500 for permanent financing of a motel construction project where it tended to show that consideration by plaintiffs consisted of their promise to pay interest, their payment of a $500.00 application fee, and establishment of an escrow account containing defendant's loan fee, and that defendant accepted plaintiffs' loan application by letters from the manager of its North Carolina office to the construction lender, copies of which were sent to plaintiffs, stating, "Please accept this letter as our commitment to fund the permanent loan on or before September 1, 1974, in an amount of $1,162,500 . . . . "

**5. Contracts § 29— breach of contract to lend money — damages**

A borrower injured by a breach of contract to lend money may generally recover from the lender the difference between the interest at the contract rate and the rate of interest which the borrower, because of the breach, must pay to obtain money, any other costs of obtaining new financing, and any consequential damages resulting from the breach which were contemplated by the parties at the time of the contract.

**6. Contracts § 29— breach of contract to lend money — damages**

Where defendant breached a contract to make a permanent loan for a motel construction project and plaintiff borrowers were unable to obtain a new loan at any interest rate for permanent financing of the motel, but had to continue financing by an interim loan at a fluctuating rate of interest, plaintiffs were entitled to recover as damages for breach of the contract to lend (1) the present cash value of the difference between the amount of interest for the agreed time of credit at the contract rate and the rate generally available to borrowers on the date of the breach; (2) the cost of additional title insurance and accounting, appraisal and brokers' fees, and (3) the interest plaintiffs have had to pay on the interim loan since defendant's breach.

**7. Contracts § 29— breach of contract to lend money — damages — deduction for likelihood of prepayment**

In an action to recover for breach of a contract to provide permanent financing for a motel construction project, the trial court erred

in making a deduction from damages for the likelihood of prepayment of the permanent loan by plaintiffs.

APPEAL by defendant from *McKinnon, Judge.* Judgment entered 28 May 1976 in Superior Court, WAKE County. Heard in the Court of Appeals 10 May 1977.

The gravamen of this action is an alleged breach by the defendant, Thomas & Hill, Inc., of its contract to make a permanent loan to the plaintiffs, P. W. D. & W. and its general partners, for the purpose of paying off a construction loan from Central Carolina Bank (CCB) which the plaintiffs had used to build a motel. The trial court, sitting by consent without a jury, found that the defendant made and breached a contract with the plaintiffs. The court entered judgment accordingly, but did not award all the damages which the plaintiffs requested.

In 1972 the plaintiffs, who are experienced businessmen but not experienced real estate developers, undertook to build a motel south of Raleigh. They located a possible site, obtained a satisfactory feasibility study, and then signed a franchise contract with Happy Inns of America. The franchiser introduced the plaintiffs to O. Larry Ward, Assistant Vice President and manager of the North Carolina office of Thomas & Hill, Inc., a mortgage banking company with headquarters in Charleston, West Virginia. As a mortgage banking firm the defendant customarily arranged so-called "permanent" financing for builders by placing the builder's request for a loan with a large lending institution. In other words, the defendant was a broker or "go-between" for builders requiring permanent financing. These permanent loans, if obtained, are used to "take-out," i.e., pay off, the construction loan which the builder usually obtains from a local lending institution, such as a bank or savings and loan company, for the limited purpose of obtaining labor and materials and building a building. One customary condition of a contract for a construction loan is that the builder obtain a permanent loan "commitment" prior to approval of the construction loan.

Defendant was a mortgage broker and did not make permanent commercial construction loans. It was capitalized for something in excess of one million dollars and had lines-of-credit with lending institutions for several millions more. The plaintiffs

Pipkin v. Thomas & Hill, Inc.

knew of these lines of credit; they did not know that they were limited to use in financing residential construction.

O. Larry Ward had no actual authority to make a permanent loan. In fact, Ward only had the actual authority to solicit loan applications. The defendant's firm policy even prevented Ward from committing his company, defendant, to try to place a permanent loan with a lender. However, the plaintiffs did not know about these restrictions on Ward's authority.

On 19 April 1973 the plaintiffs executed the defendant's application form for a permanent loan of $1,162,500 repayable over twenty-five years at nine and one-half percent interest. The application was signed by each of the individual plaintiffs, and nothing on the application indicated that if the application were accepted the defendant would not be the actual permanent lender. The application said:

"Applicant . . . agrees:

> 18. This application and your [the lender's] written approval of it, when given and accepted, shall constitute the entire agreement for loan . . . . "

The application was accompanied by a check for $500 as the agreed upon application fee. This check was not cashed. The application was also accompanied by a letter promising to pay a fee in consideration for the loan in the event a loan commitment was made. O. Larry Ward transmitted this application to the defendant's home office in Charleston. Personnel there attempted to place it with a lender, but they failed. The officers and executives at the defendant's home office were unaware of the events which subsequently transpired in North Carolina between the plaintiffs, their banker at CCB, and O. Larry Ward.

The plaintiffs began negotiations with CCB for a construction loan. They dealt with Scott Edwards, the credit manager at CCB's home office in Durham. On behalf of the plaintiffs, Edwards investigated the defendant's financial position and concluded that defendant was a reputable company and financially capable of making plaintiffs' permanent loan.

On 7 June 1973 O. Larry Ward received word from the defendant that it had not placed the plaintiffs' loan application. Nevertheless, on 11 June 1973, in response to a request from

Edwards at CCB for a permanent loan commitment, Ward wrote to Edwards, saying:

> "Thomas & Hill, Inc., is processing an application for a permanent loan for Mr. P. M. Williams, Mr. D. J. Dudley, Mr. Thomas A. Pipkin, and Mr. MacDonald [sic] Weeks, on the above property.

> "Please accept this letter as our commitment to fund the permanent loan on or before September 1, 1974, in an amount of $1,162,500.00, as outlined in the loan submission mailed to you May 24, 1973."

Copies of this letter were sent to each of the individual plaintiffs.

> Soon thereafter Edwards sent details of the CCB construction loan to Ward and asked him to incorporate them into defendant's commitment. Ward replied in a letter apparently signed by his secretary, saying:

> "Please accept this letter as our commitment to fund the permanent loan on or before October 1, 1974, in an amount of not less than $1,162,500 as outlined in my loan package submitted to you on May 24, 1973.

> "Please be further advised that your commitment dated June 26, 1973, for the construction loan is hereby made a part of our commitment to the borrowers and is attached as Exhibit A."

Again, each plaintiff received a copy of this letter.

> In a third letter from Ward to Edwards, concerning modifications in CCB's construction loan commitment, Ward agreed to the change and said:

> "[M]y only concern will be that the borrowers have the necessary fee available to pay for the permanent commitment when same is supplied to them."

In light of Ward's representations to CCB, the bank issued a construction loan to plaintiffs. Of that loan $11,625 was earmarked as the defendant's fee for its permanent loan commitment. At O. Larry Ward's direction the money was held by plaintiffs. In August 1974 an additional $11,625 was added to this amount and the entire fund of $23,250 was placed in escrow for the defendant. The money remains in that account.

In August 1974 the defendant denied any commitment to make a permanent loan. During September the plaintiffs entered negotiations with CCB for an interim loan. On 1 October 1974 CCB accepted a new demand note from the plaintiffs at a floating interest rate of prime plus 2% in replacement for the construction loan. In December 1975 the interest rate was changed to prime plus 3%. Between 1 October 1974 and the time of the trial the plaintiffs paid $184,619.49 in interest on this interim loan; they have paid nothing on the principal. The plaintiffs have been unable to find permanent financing elsewhere.

Evidence indicates that on 1 October 1974 the "going" commercial rate of interest for a long term loan was 10½%. However, little or no money was available in the country for motel financing. In their attempt to find permanent financing the plaintiffs spent $3,000 for broker's fees, $1,025 for accounting fees and $250 for appraisal fees. They also spent $1,613.12 for title insurance in connection with the interim loan from CCB.

The trial court, as the finder of fact, found that O. Larry Ward was an agent of the defendant and had the apparent authority, though not the actual authority, to bind the defendant to make a permanent loan. He further found that Ward made such a contract and that the defendant breached it. Damages were awarded to the plaintiffs equal to the total of the fees and insurance they paid plus the present value of the difference between the interest which the plaintiffs would have paid on the 9½% loan and the interest which they would have paid on a 10½% loan had they been able to obtain one. With regard to this final element of damages, the court further reduced it by more than $20,000 in order to adjust for the likelihood of early payment. However, no evidence in the record shows that the plaintiffs intended to make early payment.

Both parties appeal.

*Manning, Fulton & Skinner, by M. Marshall Happer III and Charles L. Fulton, for plaintiffs.*

*Smith, Anderson, Blount & Mitchell, by Henry A. Mitchell, Jr., Michael E. Weddington and Carl N. Patterson, Jr., for defendant.*

ARNOLD, Judge.

Defendant's position is that there was no contract, but if there was, plaintiffs were only entitled to nominal damages. Plaintiffs contend that in addition to damages awarded them they were entitled to recover interest paid on the interim loan to CCB. Thus, two questions are presented in this appeal. Was there a contract, and what is the measure of damages?

Defendant contends that it made no contract with the plaintiffs. Principally, it relies on the argument that O. Larry Ward had no authority to bind it to a contract to lend money. All parties agree that Ward lacked actual authority to make such a contract. Whether he had the apparent authority to do so is, however, a question of fact to be answered by the fact finder in light of the evidence. The evidence was mixed, and we cannot say that the court erred in finding that Ward had the apparent authority to make the contract.

[1, 2]  The scope of an agent's apparent authority is determined not by the agent's own representations but by the manifestations of authority which the principal accords to him. Restatement (2d) of Agency, § 27 (1958). In a recent decision by our Supreme Court apparent authority was defined as " . . . that authority which the principal has held the agent out as possessing or which he has permitted the agent to represent that he possesses. . . . " *Zimmerman v. Hogg & Allen,* 286 N.C. 24, 31, 209 S.E. 2d 795 (1974). An agent with apparent authority can bind his principal to a contract if the other party to the contract does not know that the agent's actual authority is less than his apparent authority.

[3]  In the present case there is evidence that Ward was held out by defendant as its agent with authority to make a loan. Ward's position as an assistant vice president and, later, vice president of the defendant is some evidence of this apparent authority. His position as the manager of the North Carolina branch is even stronger evidence. While assistant officers customarily have little authority, managers in charge of an office usually have all the authority necessary to conduct the business of that office. In a case involving an assistant bank cashier's apparent authority, it was said: "[I]t is immaterial what the person's official position may be if he is actually engaged in the *management* of the bank's interests." *Sears, Roebuck & Co. v.*

*Banking Co.,* 191 N.C. 500, 505, 132 S.E. 468 (1926) (emphasis added).

Other facts indicate that Ward had the apparent authority to bind defendant to a loan commitment. The defendant's letterhead and business cards, which were in evidence, indicated that the company was in the business of making mortgage loans. The letterhead carried the words "Mortgage Financing." The loan application form used by the defendant said nothing which indicated that the defendant limited its service to that of a broker. On the contrary, the application indicated that the defendant was committed to make a loan once it accepted the application in writing. O. Larry Ward was authorized to execute these loan applications, and nothing in the record shows that his authority in this regard was limited to that of a scrivener. This evidence, taken together, is sufficient to support the court's findings, and these findings bind this Court.

[4] Defendant also argues that there is insufficient evidence to support the court's finding that a contract was made. This argument has no merit. The letters sent by O. Larry Ward to Scott Edwards at CCB, copies of which were sent to the individual plaintiffs, constituted written acceptance of the plaintiffs' loan application and established the contract. The contract was supported by consideration, principally, the plaintiffs' promise to pay interest, and, additionally, their payment of a $500 application fee and establishment of an escrow account containing the defendant's fee. Evidence of a contract is ample, and that part of the judgment concluding that defendant entered a contract to loan plaintiffs on or before 1 October 1974, the sum of $1,162,500, is affirmed.

The issue of damages is now examined.

We find only a limited number of decisions in American case law which consider the measure of damages for breach of a contract to lend money. In no case do we find a determination of the question presented by this appeal: what is the measure of damages for breach of a contract to make a permanent loan for a building where the borrower is unable to obtain a new loan at any interest rate to permanently finance the building, but has to continue financing by an interim loan at a fluctuating rate of interest?

The general rule of damages handed down in England in *Hadley v. Baxendale,* 9 Exch. 341 (1854), and followed ever after is that

> "Where two parties have made a contract which one of them has broken, the damages which the other party ought to receive in respect of such breach of contract should be such as may fairly and reasonably be considered either arising naturally; i.e., according to the usual course of things, from such breach of contract itself, or such as may reasonably be supposed to have been in the contemplation of both parties at the time they made the contract as the probable result of the breach."

In other words, the injured party may recover all of the damages which were *foreseeable* at the time of the contract as a probable result of the breach either because they were a *natural* result or because they were a *contemplated* result of the breach. 5 Corbin on Contracts, § 1007, p. 70 (1964).

Still another rule of damages is that they must be measurable with reasonable certainty, i.e., they must be more than speculative. This rule is not a rigid one, and it usually applies in the context of a claim to recover expected but unrealized profits, which, allegedly, would have been earned but for the breach. 5 Corbin on Contracts, § 1022, p. 138 (1964). If a breach is such that in the usual course of things it leads to a substantial loss of such a character that the loss cannot be precisely measured, substantial compensatory damages will be awarded even though they cannot be precisely measured. 5 Corbin on Contracts, § 1021, p. 134 (1964). This is fair and reasonable. Damages are more than simple restitution. They are a means of making the injured party as whole as possible by the use of money. Some injuries are nothing more than the loss of a sum certain, and there the injured party is easily made whole. Other injuries involve loss of time, opportunity, special chattel, good will, prospective profits and other things which are difficult to measure in money. The contention that no injury has occurred because the measurement of damages is too difficult is not favored.

These simple rules of *Hadley v. Baxendale, supra,* are basic to the common law, and they are part of the law in North Carolina. *Perkins v. Langdon,* 237 N.C. 159, 74 S.E. 2d 634 (1953); *Machine Co. v. Tobacco Co.,* 141 N.C. 284, 53 S.E.

885 (1906). To recover damages for breach of a contract the plaintiff must show that the damages were the natural and probable consequence of the breach, and that they can be calculated with reasonable certainty. *Pike v. Wachovia Bank and Trust Co.*, 274 N.C. 1, 161 S.E. 2d 453 (1968). The damages are to be measured at the time of the breach. *Maxwell v. Proctor & Gamble Distributing Co.*, 204 N.C. 309, 168 S.E. 403 (1933). Special damages may also be awarded for injury which occurred after the breach if such an injury was within contemplation of the parties at the time the contract was made. *Perkins v. Langdon, supra.*

Very few decisions in North Carolina have dealt with the breach of a contract to lend money. In *Coles v. Lumber Co.*, 150 N.C. 183, 188, 63 S.E. 736 (1909), it is stated:

> "The measure of damage for a failure [to lend money as contracted] would be any extra expense to which [the borrower] was put to obtain the money. The failure to perform an agreement to loan a man money, unless some special and conseqential damages were shown to be in contemplation of the parties when the contract was made, would not subject [the lender] to speculative damage."

In accord is *Newby v. Realty Co.*, 180 N.C. 51, 103 S.E. 909 (1920), where it was held that the plaintiffs might recover both the money lost and the profits they failed to make when defendant breached the contract to lend them money to acquire an option on land. These two cases are in accord with the general rules already discussed, and they would seem to allow the injured borrower to recover any money spent to make himself whole, including the cost of negotiating a new loan and the difference, if any, between the interest in the original contract and in the new loan, if such costs are a natural or contemplated consequence of the breach.

[5] From decisions throughout the country it can be seen that the difference between the interest at the contract rate and the rate of interest which the borrower, because of the breach, must pay to obtain money is the common measure of damages for breach of a contract to lend money. *Bank of New Mexico v. Rice*, 78 N.M. 170, 429 P. 2d 368 (1967); *Columbian Mut. life Assur. Soc. v. Whitehead*, 193 Ark. 598, 101 S.W. 2d 455 (1937); *F. B. Collins Inv. Co. v. Sallas*, 260 S.W. 261 (Tex. Civ. App., 1924); *Culp v. Western Loan & Building Co.*, 124 Wash. 326,

---

Pipkin v. Thomas & Hill, Inc.

---

214 P. 145 (1923) ; *Shurtleff v. Occidental Building & Loan Ass'n,* 105 Neb. 557, 181 N.W. 374 (1921) ; *Murphy v. Hanna,* 37 N.D. 156, 164 N.W. 32 (1917) ; *Hedden v. Schneblin,* 126 Mo. App. 478, 104 S.W. 887 (1907) ; 5 Corbin on Contracts, § 1078, p. 446 (1964) ; Restatement of Contracts § 343.

In addition to the difference in interest rates, the injured borrower may recover any other costs of obtaining new financing, plus consequential damages which result from the breach where they were contemplated by the parties at the time of the contract. *Coles v. Lumber Co., supra; Davis v. Small Business, Inv. Co. of Houston,* 535 S.W. 2d 740 (Tex. Civ. App., 1976) ; *Bank of New Mexico v. Rice, supra; Zelazny v. Pilgrim Funding Corp.,* 244 N.Y.S. 2d 810 (1963) ; *Dodderidge v. American Trust and Savings Bank,* 98 Ind. App. 334, 189 N.E. 165 (1934) ; *Hunt v. United Bank & Trust Co.,* 210 Cal. 108, 291 P. 184 (1930) ; *F. B. Collins Inv. Co. v. Sallas, supra; Culp v. Western Loan & Building Co., supra; Corbin, supra;* Restatement of Contracts, *supra.*

It has been said that an injured borrower can recover nothing but nominal damages for breach of a contract to lend money, because, in contemplation of law, there is always money available in the marketplace. *Lowe v. Turpie,* 147 Ind. 652, 44 N.E. 25 (1896). Not every injury resulting from a breach of contract to lend money can be made whole by money, but the holdings of such old, uncommon cases are ill-reasoned, unjust, and they should be rejected. *See 5 Corbin on Contracts,* § 1078, pp. 447-448 (1964). In the increasingly complex world of business and economics money is a commodity which not only becomes scarce but unavailable to particular would-be borrowers. A lender who, with knowledge of the borrower's purpose for acquiring the loan, contracts to lend the money, and then reneges, should reasonably be able to foresee the injury caused by his breach. In the case at bar, but for the lender's commitment to lend the money the borrowers would have acquired another commitment, or else they would not have proceeded with their project. It is natural and foreseeable that the borrower may have to pay new fees and higher interest for refinancing. It is likewise within the contemplation of the lender, where the lender knew the borrower's purpose for acquiring the loan, that future loans for such purposes may become unavailable in the money market. A lender who breaches a contract to

lend money is liable for all the foreseeable damages, both natural and contemplated, which proximately arise from the breach.

The plaintiffs, in the case at bar, clearly have been injured by defendant's breach. They have been forced to negotiate an interim loan with CCB at a high interest rate, and they have been forced to attempt to negotiate for a new permanent loan, incurring expenses they would not have incurred but for the breach. They were forced into a different, and unfavorable, money market where the commercial rate of interest, at the time of the breach, was $10\frac{1}{2}$ percent instead of the contract rate of $9\frac{1}{2}$ percent, and, more importantly, they were unable to obtain money for permanent financing of their motel.

[6] The trial court correctly ruled that plaintiffs were entitled to recover: (1) the cost of additional title insurance; (2) the cost of additional brokers' fees; (3) the cost of additional accounting fees; (4) and the cost of additional appraisal fees. All of these were foreseeable expenses which, but for the breach, plaintiffs would not have incurred.

With respect to the remaining damages the proper measure is the interest calculated at $10\frac{1}{2}\%$ for 25 years from the date of trial, less the interest calculated at $9\frac{1}{2}\%$ for 25 years from 1 October 1974, which but for the breach the plaintiffs would have had to pay. This difference must then be discounted to its present cash value as of the time of trial.

The basic measure of damages here is the difference between the rate of interest during the agreed time of credit (twenty-five years in the case at bar) as specified in the contract, and the rate of interest generally available to borrowers on the date of the breach. *See, Hedden v. Schneblin, supra;* 36 A.L.R. 1408, 1411 (1925). The purpose of awarding money damages for any injury is to try to put the injured party in as good a position as if the injury had not occurred. Obviously this cannot be done with mathematical certainty, but in all fairness the difficulty in measuring damages should not bar recovery.

Applying the principle that a lender who breaches a contract to lend money is liable for all the foreseeable damages, both natural and contemplated, which proximately arise from the breach, the trial court also should have allowed recovery for interest plaintiffs had to pay to CCB on the interim loan after defendant's breach. This interest was part of the cost of

negotiating new financing. It was foreseeable, and but for the breach it would not have occurred.

[7]   Finally, the trial court found that there was a likelihood of prepayment of the permanent loan by plaintiffs and made an additional reduction, or discount, for the likelihood of prepayment. This portion of the judgment cannot be sustained and is stricken. While there is evidence to indicate that prepayment is common there is no evidence that plaintiffs contemplated early payment.

This case is remanded to Superior Court of Wake County for entry of judgment in accordance with this opinion.

Affirmed in part.

Modified in part and remanded.

Judges MORRIS and HEDRICK concur.