David George HARSHA and Baxter Feed
Center, Inc., Appellees,

v.

STATE SAVINGS BANK and J.E.
Edge, Appellants.

No. 65188.

Supreme Court of Iowa.

March 14, 1984.

Rehearing Denied April 6, 1984.

Rehearing Denied May 10, 1984.

B.C. Clayton and Roger Williams of Diehl, Clayton, Cleverley, Knopf & Williams, Newton, for appellants.

Frank G. Wieslander, Altoona, and Samuel S. Zelden, Des Moines, for appellees.

Considered by UHLENHOPP, P.J., and HARRIS, LARSON, CARTER, and WOLLE, JJ.

UHLENHOPP, Presiding Justice.

This appeal presents questions that arose from an alleged oral agreement by the State Savings Bank of Baxter, Iowa (bank), through its president, Jack E. Edge, to lend money to David G. Harsha and Richard L. Perry to open and operate a livestock feed sales business to be known as Baxter Feed Center, Inc. (Baxter Feed).

The following issues were submitted to the jury at trial: (1) whether the bank made and subsequently breached a contract to lend $25,000 to Baxter Feed on a long-term basis; (2) whether acts by the bank and Edge tortiously interfered with prospective business relationships of Baxter Feed; and (3) whether the bank and Edge intentionally inflicted severe emotional distress upon Harsha. The jury returned the following verdicts: for Baxter

Feed and against the bank in the sum of $126,000 for breach of contract; for Baxter Feed and against the bank and Edge in the sums of $104,864 compensatory and $85,000 punitive damages for tortious interference with prospective business relationships; and for Harsha and against the bank and Edge in the sums of $50,000 compensatory and $15,000 punitive damages for intentional infliction of severe emotional distress. The trial court found that the contract and tortious interference verdicts were duplicative, but otherwise upheld the verdicts.

The bank and Edge appealed and Harsha and Baxter Feed cross appealed. The bank and Edge argue inter alia on appeal that no contract to lend money existed because of lack of consideration and that substantial evidence was not introduced in support of the two tort claims. Baxter Feed argues inter alia on cross appeal that the ruling regarding duplicative damages was erroneous.

■ The case was tried by ordinary proceedings and our review is on assigned errors. Iowa R.App.Proc. 14(f)(1).

Viewing the evidence in the light most favorable to the verdicts, the jury could find the facts substantially as follows. In the spring of 1971, Harsha and Perry discussed the possibility of opening their own livestock feed sales business. The two included Edge in some of their conversations as they were interested in obtaining a long-term bank loan guaranteed by the Small Business Administration (SBA). Various loan amounts were considered. Edge testified the loan was to be for $15,000. Harsha and Perry, however, sought and obtained an SBA guarantee of $25,000, and Edge made the note for that amount.

Harsha and Perry then prepared to open the business. They acquired a place to operate, made arrangements with a producer to obtain feed to sell, contributed $2500 each to the business, and incorporated as Baxter Feed Center, Inc. They opened for business in September 1971.

During the first year several events occurred: (1) Baxter Feed lost $2549, a sum more than $2000 less than the first-year loss of $4560 originally projected; (2) Perry became displeased, left the business, and was replaced by Harsha's mother, Zelda L. Harsha; (3) Baxter Feed executed a promissory note to the bank for $25,000, and the bank disbursed $5000 of that amount on each of three dates: November 2 and December 10, 1971, and June 9, 1972; and (4) Baxter Feed began to repay the long-term loan at a monthly rate of $397 in principal and interest.

Edge testified he became displeased with Harsha's management: running up large accounts receivable instead of selling on feed contracts, and failing to collect accounts vigorously. In June 1972, the bank informed SBA by letter that it would lend no more long-term money than $15,000 already disbursed and asked that the monthly payment figure be reduced accordingly. The amount of the reduced figure, $233.80, was not provided until a second letter was sent to SBA in July. In July or August 1972 Harsha discovered what the bank had done, and in September 1972 he began repayment at the monthly rate of $233.80. He paid this lower figure through October 1975.

Over the life of the business Harsha also obtained $19,000 as capital funds from his mother. In addition, the bank did not cease making loans to Baxter Feed; on several occasions it provided money on a short-term basis. The jury could find from the evidence, however, that the effect of losing $10,000 in long-term funds was damaging to Baxter Feed. It reduced Baxter Feed's ratio of current assets to current liabilities to a point of nearly 1-to-1, well below the usual minimum of 2-to-1. The impact of the lack of long-term money became apparent as early as November-December 1972. On November 24 the bank lent Baxter Feed $3000 on a thirty-day note for the purchase of feed at a favorable price. On December 29 Baxter Feed owed $3000 plus $24 interest on the short-term note as well as $233.80 on the long-term note, instead of $397 which would have

been owed if $25,000 in long-term money had been provided.

Harsha continued to operate with the short-term loans but the business began losing more money. Projections of profits of $3305 in 1973, $7404 in 1974, and $13,348 in 1975 turned into net losses of $739, $2105, and $7968 respectively. To maintain some cash flow, Harsha tried to collect accounts receivable before the time of payment agreed upon, which had a predictable detrimental effect on business.

By the fall of 1975 Baxter Feed was in very poor financial condition. Harsha consulted Edge, who suggested bankruptcy. Harsha closed the business at the end of November 1975, and filed for bankruptcy in October 1976.

Harsha claims that Edge calculated to destroy Baxter Feed and succeeded in doing so, and that Edge's motive was the purchase of a competing feed sales business, the Country Farm Store of Baxter, owned by Charlotte L. McCormick. This involves the McCormick matter, which takes us back in time.

The fact was well-known in Baxter that McCormick desired to sell her business. In 1970 she was forced to undergo Chapter XI bankruptcy proceedings after an employee purchased cattle (supposedly corn) for his own benefit in the amount of approximately $55,000. Thereafter McCormick wanted only to rebuild the business to the point at which she could dispose of it.

In the summer of 1972, about the time Edge decided not to make the final $10,000 of the Baxter Feed long-term loan, McCormick visited with Edge and borrowed money to purchase a portable mill for her business. In the process, Edge became aware of her financial condition.

About a year later, Harsha became interested in purchasing McCormick's business. In the fall of that year, 1973, he executed an agreement with McCormick to purchase her Country Farm Store for $80,000 plus approximately $25,000 for inventory, rolling stock, and accounts receivable, with a possession date of November 12, 1973. Ac-

cording to Harsha, Edge helped him apply for an SBA guarantee for a loan of $63,000 to assist him complete the deal with McCormick; SBA did approve such a guarantee; Edge never informed Harsha of the approval; and as a result the Harsha-McCormick deal fell through. Edge testified he notified Harsha of the SBA approval but the total amount needed, in excess of $100,-000, would overextend Harsha's credit, and the McCormick-Harsha deal was not completed for that reason. Edge cancelled the SBA guarantee.

McCormick listed her property with a realtor. In April 1974, Dean Flora, owner of another Baxter livestock feed sales business, Baxter Grain & Coal Company, became interested in the McCormick property. Flora approached Edge to ascertain whether he could obtain financing to buy it. Edge telephoned the realtor and discovered that the McCormick property could be bought for $60,000. Flora borrowed $20,-000 for a down payment and obtained an SBA guarantee for a loan of $80,000 (which included the down payment) to buy and renovate the property.

The ostensible way the Flora-McCormick transaction was handled and the actual transaction were not the same. Flora testified he was apprehensive that McCormick would not sell to him, a competitor. Edge therefore handled the transaction with McCormick as if he were the principal. He signed the purchase agreement and a down payment check of $1000 in his own name, and his name appeared in the space in the agreement for the buyer.

Thereafter, however, the typed name "Jack Edge" was scratched from the real estate contract and replaced with the name "Baxter Grain & Coal Company"; Flora signed the contract; the down payment checks—one for $1000 and one for $19,000 —were paid out of the account of Baxter Grain & Coal Company; McCormick conveyed title to that company; and that company owned and operated the property. Edge was not shown to have any financial interest in Flora's business, and Flora testified Edge did not own and never had

owned stock in Baxter Grain & Coal Company. The only financial benefit flowing to the bank or Edge was interest on the money Flora borrowed to make the purchase. No contrary proof was produced and no evidence was introduced that Edge or the bank has any interest in the (former) McCormick property.

We turn to the parties' arguments.

I. *Contract claim.* The bank argues that the claimed agreement to lend $25,000 lacked consideration. Alternatively, it argues that the trial court submitted a wrong measure of damages to the jury and that a proper foundation was not laid for expert testimony as to damages and causation, but it does not address the causation issue in the event the expert testimony is in fact admissible. It also argues that the trial court erred in an instruction on acquiescence.

A. Initially, the bank attempts to draw a distinction between a promise to lend money and an actual loan of money. It argues that more consideration than a promise to repay is required to support a promise to lend money.

The jury could find the basic facts on this issue to be that the bank initially promised to lend Baxter Feed $25,000 at interest, subject to SBA approval which was obtained. The record will not support a finding that Baxter Feed expressly promised to borrow the money; we need not decide whether a finding could reasonably be made of a promise implied in fact to borrow the money. But the record shows without question that Baxter Feed did give the bank its note for $25,000 in response to the bank's promise to lend.

The bank's promise to lend may be considered an offer to be accepted by performance—an offer to lend in return for Baxter Feed's giving its note for the loan. Under such circumstances, an offer and an acceptance both existed when the bank promised to lend and Baxter Feed performed by giving its note. Restatement (Second) of Contracts § 50, Comment *b* (acceptance by performance), § 53, Comment *a* (1981).

The bank is correct that for its promise to lend to be enforceable, consideration for the promise was essential. The consideration might consist of a return promise by Baxter Feed to borrow at interest, or of a bargained-for performance by Baxter Feed in actually giving its note at interest. *Id.* § 71 (consideration may consist of a performance or a return promise), § 72 ("any performance which is bargained for is consideration"—with exceptions not involved here). The conclusion is reasonable under the evidence that the bank bargained for Baxter Feed's giving its note at interest, which Baxter Feed did, and that consideration for the bank's offer to lend existed in that performance by Baxter Feed. *See Pugh v. Jackson,* 154 Ky. 649, 651, 157 S.W. 1082, 1083 (1913); *Hedden v. Schneblin,* 126 Mo.App. 478, 486, 104 S.W. 887, 889 (1907); *Price v. Van Lint,* 46 N.M. 58, 67, 120 P.2d 611, 615 (1941); *Pipkin v. Thomas & Hill, Inc.,* 33 N.C.App. 710, 717, 236 S.E.2d 725, 730 (1977), *rev'd in part on other grounds,* 298 N.C. 278, 258 S.E.2d 778 (1977); *Farabee-Treadwell Co. v. Union & Planters' Bank & Trust Co.,* 135 Tenn. 208, 216, 186 S.W. 92, 93 (1916); *Morgan v. Young,* 203 S.W.2d 837, 845 (Tex.Civ.App.1947).

B. We approach two other arguments of the bank together—wrong measure of damages and insufficient foundational facts.

The bank contends that the measure of damages for breach of a contract to lend money is limited to the difference, if any, between prevalent interest rates and the loan rate promised in the breached contract. *Hixson v. First Bank of New Sharon,* 198 Iowa 942, 200 N.W. 710 (1924); *Thorp v. Bradley,* 75 Iowa 50, 39 N.W. 177 (1888); *Bridgkort Racquet Club v. University Bank,* 85 Wis.2d 706, 271 N.W.2d 165 (1978); 11 *Williston on Contracts* § 1411, pp. 613–14 (3d ed. 1968); 22 Am.Jur.2d *Damages* § 68, at 101–02 (1965); 25 C.J.S. *Damages* § 79, 882–83 (1966).

This general rule, however, does not invariably apply. "[I]t will frequently happen that the borrower is unable to get

money elsewhere, and, if the defendant had notice of the purpose for which the money was desired, he will be liable for damages caused by plaintiff's inability to carry out his purpose, if the performance of the promise would have enabled him to do so." 11 *Williston on Contracts* § 1411, at 614 (1968); *see* 22 Am.Jur.2d *Damages* § 69, at 103–04 (1965); Annot., 4 A.L.R. 4th 682, 698–708 (1981).

■ Although Baxter Feed refers to its damages as the lost value of the business, essentially it is seeking the lost profits it claims it would have reaped if it had been allowed to stay in business by the use of the balance of the long-term loan. If the profits asked as damages would have arisen had the contract to lend not been breached, the presumption is that the profits were in the contemplation of the defaulting lender at the time the contract was made, and if they can be proved with reasonable certainty they are recoverable. *Shinrone, Inc. v. Tasco, Inc.*, 283 N.W.2d 280, 286 (Iowa 1979); 22 Am.Jur.2d *supra* § 174, at 246–47 (1965). When recovery of such profits is denied, the reason ordinarily is that under the evidence they are "speculative, contingent, conjectural, remote, or uncertain." *Shinrone*, 283 N.W.2d at 286; 22 Am.Jur.2d *supra* § 42, at 735.

■ In Iowa we also recognize the "new business rule" which deems "potential profits from an untried business" as too speculative to be recoverable. *City of Corning v. Iowa-Nebraska Light & Power Co.*, 225 Iowa 1380, 282 N.W. 791 (1938); *Creamery Package Manufacturing Co. v. Benton County Creamery Co.*, 120 Iowa 584, 95 N.W. 188 (1903); *United States v. Dura-Lux International Corp.*, 529 F.2d 659, 663 (8th Cir.1976); *Lakota Girl Scout Council v. Havey Fund-Raising*, 519 F.2d 634, 640 (8th Cir.1975).

In order to recover substantial damages, Baxter Feed must thus demonstrate that two restrictions are inapplicable under the facts: the general rule limiting damages for breach of a lending contract to the difference in interest rates, and the new business rule.

As to the first obstacle, evidence was presented that Harsha was unable to borrow elsewhere for the balance of the original loan of $25,000 because he used all his available resources to secure the loan from the bank. Moreover, Edge, and thus the bank, was fully aware of the uses to which the borrowed money was to be put, the opening and operation of the feed business. The issue of substantial damages was thus submissible, subject to the new business rule.

■ The rationale underlying the new business rule is that "[e]xpected profits from a new commercial enterprise [are] too remote and speculative to warrant judgment for their loss because there are no available data of past business from which the fact of anticipated profits could have been established." *City of Corning*, 225 Iowa at 1389, 282 N.W. at 796. Baxter Feed's expert gave estimates of its losses from the bank's breach; essentially they were estimates of lost profits. The bank claims the new business rule is applicable to these estimates because Baxter Feed was a start-up business without a history of success upon which its expert witness could base his opinion, and the expert's opinion was therefore speculation and conjecture and thus inadmissible as evidence, citing *Wolf v. Murrane*, 199 N.W.2d 90 (Iowa 1972), and *Dougherty v. Boyken*, 261 Iowa 602, 155 N.W.2d 488 (1968).

We discussed the general principles governing opinion evidence in *Haumersen v. Ford Motor Co.*, 257 N.W.2d 7, 11 (Iowa 1977):

Iowa is committed to a liberal rule which allows opinion testimony if it is of a nature which will aid the jury and is based on special training, experience, or knowledge with respect to the issue in question. The receipt of such evidence rests largely in the discretion of the trial court and its ruling will not be disturbed absent manifest abuse of that discretion. The court's discretion is not unlimited. The facts upon which the expert bases his opinion must be sufficient to enable

the witness to express an opinion which is more than mere conjecture. Irrespective of the manner in which the opinion question is phrased, the opinion remains such and the trier of fact is at liberty to reject it. Only in clear cases of abuse is admission of such evidence found prejudicial.

The opinion evidence offered in *Haumersen* concerned the condition of a vehicle at the time of an accident. We held "[t]he evidence did provide some basis for a rational belief that conditions [the witness] related were present at the time of the accident; thus the facts on which he based his opinion were sufficient to enable him to express an opinion which was more than mere conjecture." 257 N.W.2d at 12.

The principles expressed in *Haumersen* were those involved in *Dougherty* and *Wolf*, cited by the bank. In *Dougherty*, however, the facts were different; this court decided that the witness' opinions were merely conjecture when based on the unstated results of an out-of-court discussion. The court stated, "Before [the jury] can evaluate an expert's opinion, [it] must be shown what it is founded on. This may be done by having the witness state what facts he relies on and their source or by having facts assumed to be true by way of a hypothetical question." *Dougherty*, 261 Iowa at 614, 155 N.W.2d at 495. In *Wolf*, we dealt with a business situation; the expert witness was asked to give his opinion as to the value of a partnership. The expert's foundational information was supplied solely by the plaintiff, and the expert admitted he did not consider all available data (he did not examine the books of the business or its tax returns for previous years). *Wolf*, 199 N.W.2d at 96. We held that where "facts on which the expert opinion is based are not sufficiently stated" the opinion is inadmissible. *Id.*

The present case is distinguishable from these two decisions. Here the well-qualified expert carefully explained to the jury the nature and source of the facts he relied on in formulating his opinion. He testified that given projections of future profits were conservative, assuming a long-term loan of $25,000. He pointed out that the first-year actual loss was more than $2000 less than the projected loss for that year. He made clear that actual profit-loss figures for other years were unavailable because of the bank's own breach of its loan contract before the first year of business was completed. The expert also set forth how he took into account factors other than financing, such as the newness of the business and the effect of proper management and work habits on profitability. Although he did not have personal knowledge of Harsha's management skills and work habits, he pointed out that guidance was readily available if management skills were lacking. Other evidence showed that Harsha was willing to put sufficient effort into the business. The trial court did not abuse its discretion in admitting the opinions of the expert witness unless they were barred by the new business rule.

■ The new business rule is not absolute. If factual data are presented which furnish a basis for compilation of probable loss of profits, evidence of future profits should be admitted and its weight, if any, should be left to the jury. *Standard Machinery Co. v. Duncan Shaw Corp.*, 208 F.2d 61, 64 (1st Cir.1953) ("Thus as we see it a sharp line of distinction should not be drawn between old and new businesses, but recourse should be had in both situations to the basic question whether a prospective loss of net profits has been shown with reasonable certainty."); *Burks v. Sinclair Refining Co.*, 183 F.2d 239 (3rd Cir. 1950); *Fisher v. Hampton*, 44 Cal.App.3d 741, 118 Cal.Rptr. 811 (1975); *Riddle v. Dean Machinery Co.*, 564 S.W.2d 238 (Mo. App.1978); *El Fredo Pizza, Inc. v. Roto-Flex Oven Co.*, 199 Neb. 697, 261 N.W.2d 358 (1978); *Biothermal Process Corp. v. Cohu & Co.*, 119 N.Y.S.2d 158, *aff'd in part, rev'd in part on other grounds*, 283 App.Div. 60, 126 N.Y.S.2d 1, *aff'd*, 308 N.Y. 689, 124 N.E.2d 323 (1954). In this case we have projections of profitability based on experience in the industry; the expert's consideration of the projections and his

own experience with new businesses; the willingness of Harsha to put in the time and effort needed to make the business succeed, and his prior sales experience; and the inability of Baxter Feed to turn a profit during the years it operated, as the jury could find, growing out of the breach by the bank itself. Although the question is close, we hold that the trial court did not abuse its discretion in admitting the expert's estimates, and that the new business rule did not prevent submission to the jury of the issue of loss of future profits.

■■■ Finally on the damage issue, we do not disturb jury verdicts pertaining to damages unless they are flagrantly excessive or inadequate, so out of reason so as to shock the conscience, the result of passion or prejudice, or lacking in evidentiary support. *Fetters v. City of Des Moines*, 260 Iowa 490, 499, 149 N.W.2d 815, 821 (1967), *rev'd on other grounds, Mease v. Fox*, 200 N.W.2d 791 (1972). None of those factors are evident here. The jury's award of $126,000 compensatory damages for breach of contract, while generous, was within the evidence and should be allowed to stand.

■■■ C. The bank also asserts that the trial court erred in its instruction as to the proof required in order to establish acquiescence in the breach of the contract. Assuming, as the bank claims, that acquiescence and waiver are closely akin, an *intent* to acquiesce or waive is essential. *Humboldt Livestock Auction, Inc. v. B & H Cattle Co.*, 261 Iowa 419, 432, 155 N.W.2d 478, 487 (1967) ("he *intended* to waive or abandon his right"—emphasis added); *Continental Casualty Co. v. G.R. Kinney Co.*, 258 Iowa 658, 663, 140 N.W.2d 129, 130 (1966) ("the intention of the party charged to waive his right must clearly appear"). We have examined the record and do not find substantial evidence of intent to acquiesce or waive. The question of error in the instruction is therefore moot.

■■■ II. *Tortious interference.* Interference with prospective business rela-

tionships is an intentional tort which requires a showing that the actor had a purpose to "injure or destroy" the plaintiff's business. *Farmers Cooperative Elevator, Inc. v. State Bank*, 236 N.W.2d 674, 679 (Iowa 1972). *See also Page County Appliance Center, Inc. v. Honeywell, Inc.*, 347 N.W.2d 171 (Iowa 1984); *Clark v. Figge*, 181 N.W.2d 211 (Iowa 1970). If a defendant acts for two or more purposes, his improper purpose must predominate in order to create liability. *Leigh Furniture & Carpet Co. v. Isom*, 657 P.2d 293, 307 (Utah 1982); W. Prosser, *Handbook of the Law of Torts* § 129, at 943 (4th ed. 1971). The tort may also be committed by improper means. *Top Service Body Shop, Inc. v. Allstate Insurance Co.*, 283 Or. 201, 205, 582 P.2d 1365, 1371 (1978); *Leigh Furniture*, 657 P.2d at 308–11. Deliberate breach of a contract is generally not considered to be improper means, as the law remedies such breaches with damages calculated to give the injured party the benefit of the bargain; generally no need thus exists for additional tort remedies. *Leigh Furniture*, 657 P.2d at 309; *see also R.E.T. Corp. v. Frank Paxton Co.*, 329 N.W.2d 416, 420 (Iowa 1983) (distinguishing tort and contract damages). Where however a party breaches a contract with the immediate purpose of injuring or destroying prospective business relationships the means may be considered improper. *Buxbom v. Smith*, 23 Cal.2d 535, 548, 145 P.2d 305, 311 (1944) (breach of contract was intended as means of injuring plaintiff and "constitutes an unfair method of interference with advantageous relations"); *Schisgall v. Fairchild Publications, Inc.*, 207 Misc. 224, 232, 137 N.Y.S.2d 312, 319 (1955) (for a party to breach a contract and pay damages is one case but if the party goes further and "act[s] with intent to inflict injury beyond that contemplated as a result of the mere breach of a contract ... the contract does not grant the defaulter immunity from tort liability"); *Leigh Furniture*, 657 P.2d at 309; *Cherberg v. People's National Bank of Washington*, 88 Wash.2d 595, 603, 564 P.2d 1137, 1143 (1977) ("[where] the conduct of the breach-

ing party indicates a motive to destroy some interest of the adverse party, a tort action may lie and items of damage not available in contract actions will be allowed").

 For Baxter Feed to succeed on its claim for tortious interference with prospective business relations, the record must contain substantial evidence showing that Edge acted with a predominately improper purpose or by improper means. To sustain this burden Baxter Feed relies on circumstantial evidence. Circumstantial and direct evidence are equally probative, *State v. O'Connell*, 275 N.W.2d 197, 205 (Iowa 1979), but the substantial evidence rule requires that the circumstances have "sufficient probative force to constitute the basis for a legal inference, and not for mere speculation...." 32A C.J.S. *Evidence* § 1039, pp. 753–54 (1964); *see also* 30 Am. Jur.2d *Evidence* § 1091, at 251 (1967) ("Circumstantial evidence must do more than raise a suspicion; it must amount to proof. It is necessary that there be some reasonable connection between the facts proved and the fact at issue."). Circumstances are not sufficient when the conclusion in question is based on surmise, speculation, or conjecture. *Green v. Ralston Purina Co.*, 376 S.W.2d 119, 123–24 (Mo.1964); *Adams v. Smith*, 479 S.W.2d 390, 397–98 (Tex.Civ. App.1972).

 Baxter Feed claims that by refusing in the summer of 1972 to advance the final $10,000 of long-term money, Edge set forces in motion which ultimately destroyed it and prevented it from having future business relationships, and that Edge refused to advance the final $10,000 with an improper objective—to eliminate Baxter Feed as a competitor after Edge eventually acquired the McCormick property.

The problem with this claim is that essential circumstances are missing. Edge's name on the McCormick papers did not occur until the spring of 1974, a hiatus of over a year and a half. Moreover, while the evidence shows that Edge appeared in the McCormick papers as buyer, the evidence also shows overwhelmingly that Flora was the actual purchaser, acquired the property, and thereafter owned and operated it. A finding on this record that Edge acquired the property himself could not stand. An alleged nexus between the refusal to advance more long-term money in 1972 and the McCormick transaction in 1974 does not rise above the level of suspicion and conjecture, which are insufficient even for circumstantial evidence.

An argument might also be advanced that Edge cut off the final $10,000 for the improper purpose of protecting the purchaser of the McCormick property, Flora, from competition. But here again we have the undeniable facts that the bank terminated further long-term credit to Baxter Feed in the summer of 1972 but Flora did not come into the picture as a prospective McCormick purchaser until April 1974.

*Substantial* evidence of a connection between Edge's refusing further long-term credit and the later McCormick transaction does not appear. Any relationship is simply too attenuated. This tort basis of liability should not have been submitted for jury consideration.

III. *Severe emotional distress.* The bank claims that Harsha did not introduce substantial evidence of the tort of severe emotional distress.

 The elements of this tort are

(1) Outrageous conduct by the defendant;

(2) The defendant's intentional causing, or reckless disregard of the probability of causing emotional distress;

(3) Plaintiff suffering severe or extreme emotional distress; and

(4) Actual and proximate causation of the emotional distress by the defendant's outrageous conduct.

*Powell v. Khodari-Intergreen Co.*, 334 N.W.2d 127, 129 (Iowa 1983). *See Poulsen v. Russell*, 300 N.W.2d 289, 296 (Iowa 1981); *Wambsgans v. Price*, 274 N.W.2d 362, 365–66 (Iowa 1979); *Meyer v. Nottger*, 241 N.W.2d 911, 918 (Iowa 1976); *Amsden*

*v. Grinnell Mutual Reinsurance Co.,* 203 N.W.2d 252, 255 (Iowa 1972); *Randa v. U.S. Homes, Inc.,* 325 N.W.2d 905, 908 (Iowa App.1982); Restatement (Second) of Torts § 46(1) (1965); *see generally* L. Blades and A. Kintzinger, *Iowa Tort Guide* §§ 11.1–.6 (2d ed. 1981); W. Prosser, *The Law of Torts* § 12 (4th ed. 1971). We consider two of the elements here—outrageous conduct and severe or extreme emotional distress.

▆▆▆ For conduct to be "outrageous" it must be "so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Restatement (Second) of Torts § 46, Comment *d* (1965) (approved in *Roalson v. Chaney,* 334 N.W.2d 754, 756 (Iowa 1983)). Here the jury found the bank, through Edge, breached a contract. We do not condone such conduct but it does not approach the requisite standard of outrageousness which is necessary to create liability. The evidence of a nexus between Edge's refusal to extend more long-term credit and the McCormick transaction is not substantial and cannot provide a foundation for a finding of outrageousness. We need not decide whether the McCormick transaction, if tied to the refusal to extend more credit, would rise to the level of outrageous conduct.

▆▆▆ The evidence pertaining to Harsha's emotional distress was also insubstantial. It showed he was bothered by creditors at night, he made enemies out of friends by trying to collect accounts receivable before they were due, he was degraded by having to go into bankruptcy, his credit was destroyed, and he had to give up plans to remodel his childhood schoolhouse into his home. His mother, Zelda Harsha, testified that he "wasn't as interested, or he was downhearted more or less" and "depressed" when the business began to go downhill.

This evidence is similar to that in cases where evidence of severe or extreme emotion distress was held to be insufficient. *Poulsen v. Russell,* 300 N.W.2d at 297

(plaintiff was "very, very down", "feeling super badly", and feeling as if he had "lost everything"); *Vicnire v. Ford Motor Co.,* 401 A.2d 148, 155 (Me.1979) (plaintiff felt "kind of down", "mad", and "nervous for about a month"); *Harris v. Jones,* 281 Md. 560, 572, 380 A.2d 611, 617 (1977) (plaintiff was "shaken up" and "felt like going into a hole and hide"); *Hubbard v. United Press International,* 330 N.W.2d 428, 440 (Minn. 1983) (plaintiff was "depressed" and became "physically ill in terms of throwing up"). The present evidence does not measure up to the proof of the distress in the cases allowing recovery. *Randa v. U.S. Homes, Inc.,* 325 N.W.2d at 908 (evidence of substantial defects in new home costing $160,000 caused near nervous breakdown); *Ford v. Hutson,* 276 S.C. 157, 165, 276 S.E.2d 776, 780 (1981) (plaintiff diagnosed as suffering from depression after suffering attack of shaking, nauseau, cramps, and hysteria).

This basis of tort liability should not have been submitted to the jury for decision.

IV. *Cross appeal.* As we have held the two tort bases of recovery are without merit, we have no occasion to consider the question in the cross appeal as to whether the tortious interference recovery duplicates the contract recovery.

We uphold the contract recovery, overturn the tort recoveries, and return the case to district court to vacate the original judgment and enter judgment in favor of Baxter Feed and against the bank in the sum of $126,000 together with interest and costs. We assess the costs in this court against the bank.

Although the authorities cited in Harsha and Baxter Feed's motion to file supplemental citations do not alter the result the court otherwise reaches, the motion is granted.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.

All Justices concur except CARTER, J., who concurs in part and dissents in part and from the result.

CARTER, Justice (concurring in part and dissenting in part).

I concur in the holding of the court in division II and division III of the majority opinion which denies recovery on plaintiffs' tort theories. I dissent from that part of the opinion which upholds the jury's award on plaintiffs' breach of contract theory.

On the breach of contract theory, I find the evidence is insufficient to permit a jury to find that the failure to advance $10,000 in long-term financing was the cause of plaintiffs' business failure. The majority considers the issues of causation and damages on the breach of contract theory as a single issue. It accepts the testimony of plaintiffs' expert witness as supporting the jury's verdict with respect to both causation and damage. This witness was shown to be qualified as an expert with respect to the profit potential of plaintiffs' business, had that business succeeded. To this extent, his views as to what plaintiffs' profits would have been, had their business succeeded, are not speculative. I find nothing in the record, however, to suggest that his views that the lack of $10,000 in long-term financing made the difference in the success or failure of the business are other than pure speculation. The jury was offered no credible theory based on evidence in the case as to why it was more likely than not that the lack of those funds caused the business to fail.

The trial court erred in permitting the jury to consider lost profits as an element of damages. I would reverse the judgment of the trial court on the contract aspects of the litigation as well as on the tort aspects of the litigation.