CORNING, City of, Appellee, v. IOWA-NEBRASKA LIGHT & POWER COMPANY et al., Appellants.

No. 44556.

DECEMBER 13, 1938.

REHEARING DENIED APRIL 7, 1939.

Lee R. Watts, and Cook & Cook, for appellants.

Ed. Fackler, Jr., and Slaymaker, Killmar & Slaymaker, for appellee.

STIGER, J.—This is an action at law in eight counts, brought by the city of Corning, Iowa, against the Iowa-Nebraska Light & Power Company and the United States Fidelity & Guaranty Company, Baltimore, Maryland, asking damages on three injunction bonds given by the defendants in a prior suit brought by the defendant Iowa-Nebraska Light & Power Company to enjoin the city of Corning from the erection of a municipal

1382

light and power plant, in which suit decree was entered for defendant. Jury waived, and cause tried to the court as an action at law.

The trial court dismissed counts 2, 4, 7, and 8, and entered judgment for plaintiff on counts 1, 3, 5, and 6. The only issues presented by defendants on appeal relate to the judgments rendered against them on counts 5 and 6 of the petition.

On June 13, 1934, the city of Corning entered into a contract with Fairbanks-Morse Construction Company for the erection of a municipal lighting plant. This contract provided that the plant was to be completed November 15, 1934. On July 9, 1934, the Iowa-Nebraska Light and Power Company, as plaintiff, (defendant in this action) brought a suit in equity against the city of Corning to restrain the city from constructing the municipal lighting plant and distribution system. On the same day, plaintiff—the power company—secured a temporary injunction restraining the city from proceeding with the erection of the plant and filed an injunction bond in the sum of $10,000. On July 21, 1934, the District Court of Iowa in and for Adams County sustained a motion of the city to dissolve the temporary injunction and on July 23 the power company appealed from the ruling to the Supreme Court. On August 2, 1934, the Supreme Court issued a restraining order enjoining the city from proceeding further with the construction contract and on the same day the power company filed with the clerk of the Supreme Court a stay bond in the sum of $15,000.

On October 12, 1934, the equity suit, case Number 8015, was tried on its merits and a decree was entered dismissing the petition of the Iowa-Nebraska Light and Power Company. On the same day the company appealed to the Supreme Court and on October 20, 1934, secured an order restraining further building of the plant pending the appeal and furnished the required $7,000 stay bond.

On April 24, 1935, the Supreme Court affirmed the judgment of the lower court dismissing the injunction suit, this decision being found in the case of Iowa-Nebraska Light & Power Company v. City of Corning (Iowa) 261 N. W. 431.

Thereupon the contractor resumed work under the contract for the construction of the plant which was completed and turned over to the city on November 1, 1935.

The injunction bonds all contained the provision that the

plaintiff in the injunction suit would pay all damages which the city would sustain by reason of the injunctions.

The contract for the construction of the municipal lighting plant provided that it would be completed November 15, 1934. Solely because of the successive injunctions and orders obtained by the power company, the completion of the plant was delayed about eleven months and the city of Corning brought this action for compensation for the loss of the use of the plant from November 15, 1934, the contract time for its completion, to November 1, 1935, which was the date it was actually completed and turned over to the city for operation.

Plaintiff divided its action into the several counts because the action is based on the breach of the several bonds.

Count 5 asks for damages based on the second injunction bond and alleges that because of the injunction issued August 2, 1934, the completion of the lighting plant was delayed for four months and approximately fourteen days and that the fair and reasonable value of the use of said plant during said period of time was the sum of $4,500 or $1,000 a month.

Count 6 seeks damages on the third bond and alleges that because of the restraining order issued October 15, 1934, the construction and completion of the plant was delayed a period of seven months and that the fair and reasonable value for the use of the system for such period of time was $7,500 or $1,000 a month and that the plant would have made a profit of that amount during such period of time if the same had been in operation. Notwithstanding the claim of the defendants to the contrary, counts 5 and 6 clearly seek damages suffered by reason of the delay in completing the plant caused by the issuance of the various injunctions and especially seek damages for loss of use of the plant from November 15, 1934, to November 1, 1935, on which latter date the plant was finally completed. There is no merit in defendants' contention that plaintiff's petition does not allege a cause of action for damages for the loss of use of the plant for the eleven months' period.

At the close of the plaintiff's testimony, defendants moved the court to withdraw counts 5 and 6 from its consideration which motion was overruled. The motion was renewed at the close of all the evidence and again overruled. The trial court also overruled defendants' motions in arrest of judgment and for judgment notwithstanding the decision of the court.

Defendants' first assignment of error is that the court erred in overruling grounds 2 and 4 of defendants' motion to withdraw counts 5 and 6 from the consideration of the court and in overruling ground 2 of division 2 of defendants' motion in arrest of judgment and for judgment notwithstanding the decision of the court.

Ground 2 of defendants' motion to withdraw counts 5 and 6 from the consideration of the court, which is entitled a "Motion for Directed Verdict", reads as follows:

"That the evidence shows that the value of the use of said plant as shown by the testimony of the plaintiff and its witnesses, is for the period of time from November 15, 1935, to October, 1936, during all of which time the evidence shows that the plaintiff would have been in enjoyment of the full and unrestricted use of the plant."

Ground 4 of said motion reads:

"That no damages for value of the loss of use to the plaintiff have been proven by any competent testimony, for that period of time during which the bonds declared on in plaintiff's petition were in force, or during the time the injunctions for which the bonds were given were in force."

Ground 2 of division 2 referred to in defendants' first assignment of error reads:

"That as to such Counts five and six, said petition shows upon its face that the plaintiff is claiming damages for the loss of the use for periods of time when the bonds and injunctions were not in force, and the said petition as to said Counts five and six, alleges damages for a period of time not covered by the injunctions, and when no injunctive restraint was present, and shows upon its face as to said Counts five and six, an attempt to recover profits for a period of time not within the period of injunctive restraint, and said petition, as to said Counts five and six, does not state a cause of action."

This assignment of error alleges in substance: (1) that the only evidence introduced by the plaintiff to prove the use value of the plant was for the period from November 15, 1935, to October, 1936, during which time plaintiff was in possession of the plant; (2) that plaintiff did not introduce any evidence of the

use value of the plant during the eleven months' period it was deprived of the use of the plant because of the injunctions; (3) that if the value of the loss of use of the plant is the correct measure of damages that plaintiff would be entitled to recover damages only during the period of injunctive restraint which was from November 15, 1934, to May 15, 1935.

We will first consider the question of the correct measure of damages in a case of this kind and the period for which damages may be recovered.

Plaintiff was entitled to compensation for the loss of the use of the plant occasioned by the injunctions. The obligation of the bonds was to pay the city all damages it would sustain by reason of the injuctions.

Defendants deny that the use value of the plant is the correct measure of damages for the delay in its construction, and further contend that if said measure of damages is correct that plaintiff could recover the rental or use value only during the time there was injunctive restraint which was from November 15, 1934, to May 15, 1935. We cannot concur with defendants' contention. The purpose of damages is to award compensation so far as is practicable for the injury received and plaintiff was entitled to compensation for damages that were the natural and proximate result of the wrongful injunctions and was not necessarily limited to a recovery of damages while the injunctions were in force if the damages flowing directly from the injunctions continued for a period of time beyond the date of their dissolution. After the last injunction was dissolved in May, 1935, the plant was completed with due diligence on November 1, 1935. The measure of damages in a case of this kind is stated in 2 High on Injunctions, 4th Ed., section 1673 as follows:

"In determining the amount of damages to be allowed upon the dissolution of an injunction restraining one from exercising acts of ownership over his real property, the courts are not governed by arbitrary rules, but proceed upon equitable principles; the defendant being entitled to such damages *as are the necessary and proximate result of such deprivation.*" (Italics supplied.)

In the case of Spears v. Armstrong, Tenn. Ch. App., 42 S. W. 37, the court states [page 38]:

1386

"It certainly results that the defendant was deprived of the use of the property during the pendency of the injunction (that is, but for the injunction the defendant would have had the use of the premises, as he proposed to erect the building), for the space of 10½ months, as found by the chancellor. * * * The rule being that when a party is deprived of the use of property wrongfully, by injunction or otherwise, he is entitled as damages to the value of the use; and in cases of property of this kind—that is, real estate—the value of the use would, of course, be, as is well settled, the reasonable rent of the property."

In the case of Hutchins v. Munn, 209 U. S. 246, 28 S. Ct. 504, 52 Lawyers' Ed. 776, the defendant was prevented from building an addition to her home by wrongful use of a restraining order. The court states [page 506]:

"We think that the auditor correctly adopted as the measure of damages the value of the use of the property for the period and season during which she was thus deprived of it as the direct result of the restraining order which, in another proceeding, has been found to have been wrongfully and inequitably sued out. The decree of the court below is affirmed."

 There is no question here of increased cost of constructing the plant due to the delay and the measure of damages in counts 5 and 6 for deprivation of the use of the plant is the use value of the property during the period of delay that was the proximate result of the wrongful injunctions, which period was eleven months. Where property, as in this case, has no rental value, the measure of damages is the use value. See Standard Supply Company v. Carter, 81 S. C. 181, 62 S. E. 150, 19 L. R. A. (N. S.) 155; Hermann v. Allen, Tex. Civ. App., 118 S. W. 794; Roberts v. White, 73 N. Y. 375, 32 C. J. 467, section 813.

The trial court held that the use value of the plant during the period for which damages are sought was its net profits during such period. Both plaintiff and defendants introduced evidence of the net earnings of the plant during its first year of operation, such evidence being based on the records of the operation of the plant. The court found that the net earnings of the plant during the first year of its operation was substantially the same as it would have earned during the prior eleven

months if the defendants had not prevented its completion on November 15, 1934. We quote from the findings of the trial court as follows:

"It was also true that there were six or seven hundred customers within the City of Corning who were then (at the time of the letting of the contract for construction of the plant) using electrical current and who had electrical equipment of various kinds which required electrical current for their operation. The situation here is quite different than would be the case where some private business enterprise is undertaken, for the reason that the business of the plant would not depend nearly so much on good will as would a private business. Instead of comparing the situation and the use of the plant after November 15th, 1934, to the starting of the ordinary new business, it would be much more fair to compare it to the taking over of a going concern.

"The evidence and the record in this case shows that in October, 1935, when the plaintiff started its operation of the plant, that the number of customers using electrical current within the City was six or seven hundred, and that the City of Corning and the residents thereof had been furnished electrical current by the defendant power company for many years prior to that time. Of course it is apparent that in order to receive the current so used by them it would be necessary to have the houses, stores, factories, etc., wired for the use of electricity, and that, of course, had been done prior to the time they began using the current.

"The difference is further emphasized when we consider that the plaintiff would have practically been in sole possession of the field had it been allowed to operate."

In the case of Standard Supply Company v. Carter, 81 S. C. 181, 62 S. E. 150, 19 L. R. A. (N. S.) 155, the court held that if the property has no rental value the use value is the measure of damages, such value "to be ascertained by inquiry into past results and the most important factors in ascertaining such past results would be the usual profits earned". Defendants do not seriously question the method adopted by the trial court in finding the use value. Their expert witness, Frank D. Paine, testified in substance that the use value of the plant from November 15, 1934, to November 1, 1935, was the same amount as the net

earnings during the first year of operation. He expressed an opinion on the amount of net profits earned during the first year's operation which opinion was based on plaintiff's Exhibit Number 52, which is the first annual report of the trustees of the plant, and defendants' Exhibits Numbers 6 to 16, inclusive, which were schedules of the physical properties of the plant and accrued depreciation, statements of revenue and expenses, and condensed operating statements prepared by him and then stated that such sum was the use value of the plant during the prior eleven months' period. Both plaintiff's and defendants' expert witnesses use the same theory and basis for estimating plaintiff's damages, the major disagreement being over the amount of depreciation in determining the net earnings of the plant. We approve the method used by the trial court in determining the amount of plaintiff's damages.

Plaintiff was not limited to damages accruing during the period of injunctive relief but was entitled to the damages that directly flowed from the wrongful injunctions as their immediate consequence and which would fairly and reasonably compensate it for the delay. Though the ban of the injunctions was lifted in May, 1935, the delay in the completion of the plant until November 1, 1935, was due solely to the injunctions.

Defendants urge that because the Corning municipal electric light, power and distributing system was a new business and had not been in operation or existence that the loss of profits or loss of use of a plant not in being were too speculative and uncertain to form a basis for recovery.

We do not concur in this contention. The city would have had a completed plant in full operation on November 15, 1934, but for the wrongful interference of the defendants and its damages are the use value or worth of the plant to the city had it been permitted to build and complete the plant according to the terms of the contract. The plant must be considered as having been in existence since November 15, 1934. In the case of Stone v. Hunter Tract Improvement Company, 68 Wash. 28, 122 Pac. 370, 39 L. R. A. (N. S.) 180, the court states [page 371]:

"It is contended that only nominal damages should have been allowed, inasmuch as the law will not take care of damages which are remote, conjectural, or speculative, that no house was on the property during the time the injunctions were in

force, and that the rental value of a house that had not been built was not a proper measure, it being admitted, or rather not denied, that the lot without the house had no rental value. Our first impression was that the theory had merit, but a more careful consideration of the principle involved impels us to hold that plaintiffs are entitled to recover damages for the loss of the use of the property, to be measured by the rental value, or what it would have been worth to respondents had they been allowed to build a house according to their original design.''

This is not a case of seeking damages for prevention of the operation of a new untried enterprise. Expected profits from a new commercial enterprise have been held to be too remote and speculative to warrant judgment for their loss because there are no available data of past business from which the fact of anticipated profits could have been established. But anticipated profits may be recovered, if established with reasonable certainty, as damages for the interruption of the use of an established business in actual operation. Sinclair Refining Company v. Hamilton, 1935, 164 Va. 203, 178 S. E. 777, 99 A. L. R. 929, and annotation; Ellerson v. Grove, 4 Cir., 1930, 44 Fed. 2d 493; Creamery Package Mfg. Co. v. Creamery Co., 120 Iowa 584, 95 N. W. 188.

Plaintiff, as stated by the trial court, in effect, took over a ''going concern'', having the same field for the sale of electric current and substantially the same customers as the utility company had during the eleven months' period it wrongfully maintained its status as sole distributor of electric current in the city. Defendants must have known that the necessary result of the injunctions would delay the completion of the plant.

The trial court was able to determine from the evidence the net earnings of the plant the first year of operation and there was sufficient evidence to support the findings of the trial court that the earnings during the preceding eleven months' period would have been substantially the same. The cause was tried to the court without a jury and there being evidence to sustain the findings of fact of the trial court they are binding and conclusive on this court. City of Cherokee v. Aetna Life Insurance Co., 215 Iowa 1000, 1004, 247 N. W. 495. It may also be said that defendants on appeal do not question the said fact findings of the trial court.

1390

Defendants insist that, conceding the plant was, in effect, an established business, the profits sought to be recovered as damages are too speculative, remote and uncertain to permit recovery and are not susceptible to legal proof. The rule against uncertain damages applies where there is uncertainty as to the cause of the damages and as to the fact of legal damages. The damages claimed must be the certain result of the alleged breach on which the injured party relied. If the damages are the result of the breach the fact that the amount of the damages is uncertain or difficult to determine does not prevent recovery if the amount of the damages can be established with reasonable certainty. Sufficient evidence must be produced to afford a basis for estimating the amount of the damages. See Hichhorn v. Bradley, 117 Iowa 130, 90 N. W. 592; Rule v. McGregor, 117 Iowa 419, 90 N. W. 811, 78 A. L. R. 858.

In the case of Anderson v. Columbia Con. Co., 94 Or. 171, 184 Pac. 240, 185 P. 231, 7. A. L. R. 653, the court states [page 247]:

"The law aims to allow full and complete compensation to an innocent party who has been damaged by the breach of a contract or commission of a tort. In practice, the law does not prove false to its theory by banning profits merely because of their nature as profits; but, on the contrary, the law endeavors faithfully to realize its aim by allowing compensation for profits which it is reasonably certain would have been made if the wrong complained of had not been done."

That the wrongful injunctions were the sole cause of the damages suffered by the city is too plain for argument and the amount of the damages could be and were determined with reasonable certainty.

The plaintiff in this case fashioned its petition on the correct measure of damages, that is, the use value of the plant, and for the correct period of time, which was the eleven months' delay in the completion of the plant, occasioned by the injunctions.

The remaining question on this assignment of error is, did the plaintiff introduce any evidence to prove the use value of the plant from November 15, 1934, the date the plant was to be completed under the terms of the contract, and November 1, 1935, the date that it was actually completed?

Defendants claim that the only testimony offered by plaintiff of the use value of the plant was for a period subsequent to the completion of the plant, that is from November 15, 1935, to October, 1936, and therefore the motion to withdraw should have been sustained.

The record does not support this claim. It is true that plaintiff did not introduce opinion evidence of the use value of the plant during the eleven months' period but we are of the opinion that there was sufficient evidence offered by plaintiff to support the judgment of the court.

Plaintiff's expert witnesses testified that after deducting depreciation, operating expenses, etc., from the gross earnings, the net earnings of the plant were about $800 a month during the first year of operation. Plaintiff's evidence also showed that Corning was a city of the second class during and prior to the year of 1934 and that its population and number of customers for electricity and the demand for electricity was substantially the same during the eleven months' delay of the completion of the plant as during the immediately following first year of operation. The plaintiff established with reasonable accuracy the net earnings of the plant for the first year of operation and introduced evidence from which the court could find and did find that the earnings of the plant for the prior eleven months' period were substantially the same amount. It follows that the contention of defendants that because plaintiff's expert witnesses did not give an opinion of the use value during the eleven months' period it did not offer any evidence of such value cannot be allowed.

Assuming, however, that plaintiff at the close of its evidence had not made out a prima facie case, any deficiency in the evidence of the plaintiff was supplied by defendants' witness Mr. Paine who testified to the use value of the plant from October, 1934, to August 1, 1935. The trial court could have found from the testimony of this witness that the use value was from $500 to $600 per month. He was not bound to accept the opinion of this expert witness as to the amount of the use value.

In the case of Pressley v. Stone, 214 Iowa 449, 239 N. W. 567, the action was one at law tried to the court. The trial court overruled defendants' motion for a directed verdict made at the close of plaintiff's evidence. The court states [page 451 of 214 Iowa, page 568 of 239 N. W.]:

1392

"The ruling was correct if. for no other reason than that there was no jury to be directed in the case. The court did in fact decide the case presumably upon its merits after the defendant had introduced his evidence and rested. The plaintiff's case was quite as strong at the close of plaintiff's evidence as it was at the close of defendant's evidence. If the trial court was right in its final ruling on the merits of the case, it became quite immaterial whether the court was right in its first ruling or not. True the appellant assigns error upon the final finding of the court. This assignment is clearly without merit. No question of law is thereby raised by the appellant, either in the assignment or in his argument thereon. The question of fact was for the court as the trier of fact, and its finding was supported by the evidence."

In the instant case the trial court tried the case on its merits and the final judgment being right his ruling on the first motion to withdraw the counts made at the close of plaintiff's testimony is of no consequence. He determined the net profits of the plant and the use value after a consideration of all the evidence which fully supports his findings and judgment.

The court entered judgment on count 5 for $3,569.91 and on count 6 for $3,753 which judgments were based on his determination of the use value of the plant during the eleven months' period.

We find no error in this assignment.

II. Defendants also allege that the court erred in overruling their motion for what is denominated a directed verdict and motion for new trial because plaintiff is not entitled to recover for the reason that it has only such powers as are expressly given to it by the legislature or necessarily inferred from the powers expressly granted, and that it has no statutory authority to operate a municipal plant for a profit.

█ Defendants admit that plaintiff is entitled to make a profit in an amount necessary to meet the requirements of the statutes that the city use the profits of the plant to pay for repairs, maintenance, cost of operation, interest and principal of bonds issued, etc., but claim that the amount authorized by statute is not involved in this suit. Defendants state:

"We submit the Board of Trustees and the officers of plaintiff city exceed their statutory duty and authority when they

fix rates and operate their utility on a basis of earnings in excess of that required for the purposes enumerated by the legislature."

It is true, of course, as contended by defendants, that municipal corporations owe their origin to and derive their powers from the legislature and can exercise only such powers as are granted in express words or fairly implied from or incident to the powers expressly granted, or such powers as are essentioal to the purposes of the corporation.

The issue presented involves a construction of chapter 312, 1935 Code, relating to public utility plants and the enactment of the 44th General Assembly, chapter 158, known as the Simmer Law, permitting cities to pay for the plants from future earnings. The Simmer Law is included in chapter 312 and consists of sections 6134-d1 to 6134-d7, inclusive.

Defendants cite among others the cases of Edgerly & Co. v. Ottumwa, 174 Iowa 205, 156 N. W. 388; Jensen v. Zurmuehlen, 185 Iowa 593, 171 N. W. 34; Saltzman v. City of Council Bluffs, 214 Iowa 1033, 243 N. W. 161, to sustain their contention that the city did not have statutory authority to make the profits for which it seeks damages. In the Edgerly case, supra, the suit was brought by a user of city water to enjoin the city from shutting off the services. One of the claims of the plaintiff was that the rates fixed by the board of trustees of the waterworks were excessive and in violation of section 749, 1897 Code (now 6159, chapter 313, 1935 Code). Said section 749 reads:

"The said board of waterworks trustees shall from time to time fix the water rentals or rates to be charged for the furnishing of water, and such rates shall be sufficient, together with the proceeds of the five-mill water levy and the sinking fund levy of two mills, for the maintenance and operation of such works, the proper and necessary extension thereof, for all repairs, and for the payment of the purchase money or cost, principal and interest, incurred in the purchase or erection of such works, as the same falls due, according to the tenor of the mortgage and bonds given to secure the payment of such purchase price or cost."

The court states [page 212 of 174 Iowa, page 390 of 156 N. W.]:

"This section not merely confers on the board of trustees full authority to fix water rents or rates, but, while exacting

that these shall be sufficient with the tax levy to meet specified purposes, impliedly prohibits fixing them in excess of what may be essential to meet such demands. *This inference is confirmed by the fact that there is no provision for other disposition of the income from the plant in excess of these needs.* Plainly enough, the enjoyment of the utility by the public at the actual cost of the service rendered, and without profit to the city, is contemplated in authorizing the acquirement of waterworks at the expense of the taxpayers.'' (Italics supplied.)

In the Jensen case, supra, the waterworks' trustees brought an action of mandamus against the city of Council Bluffs to compel it to make a five mill levy which plaintiffs had certified to the council as necessary. The council refused to make the levy on the ground that the rates and rentals from the waterworks in force were sufficient to meet all current expenses of operation and all maturing obligations and that it was not necessary to levy a tax in any amount.

The court found that the proposed five mill levy would produce $26,000 and its only effect would be to increase a needless surplus to a total of $86,000 and dismissed plaintiff's petition. The court states [page 599 of 185 Iowa, page 36 of 171 N. W.]:

''If an issue of fact had been made upon the allegations of the answer, other considerations would enter the discussion. It is to be granted that the duties of the trustees must have some flexibility and elasticity. We do not hold that the trustees are required to estimate accurately, in advance, the exact amount of the total proceeds to be raised, and that they shall be deemed to transcend their authority when such exact amount is exceeded to any extent. We recognize as a practical fact that only approximate estimates are possible. We recognize, also, that practical wisdom in the performance of such duty would require a margin of safety in the estimate. Reasonable approximation is all that can be required, even though it result in an unexpended balance of some amount. But this consideration applies only to a question of fact, and not to a mere question of law. What would be a reasonable margin of safety in a given case would ordinarily be a question of fact, which should be resolved with liberality in favor of the estimate of the trustees. A working balance of some reasonable amount might, as a matter of fact, be deemed

a necessity to the practical performance of their duty by the trustees.''

It will be observed that in the Edgerly case the court states that:

''This inference [that the requirement that rates shall be sufficient with the tax levy to meet specified purposes impliedly prohibits fixing rates in excess of what may be essential to meet such demands] is confirmed by the fact that there is no provision for other disposition of the income from the plant in excess of these needs''.

Both of said cases limit a city to rates which together with the taxes levied will produce an amount that will reasonably approximate the demands of the statutes.

Since the Edgerly and Jensen cases were decided, statutes have been enacted providing for the disposition of the profits of utility plants in excess of the amount necessary to meet the statutory requirements. Code sections 6134-d1, 6151-b1, -b2, -c1, -b3, and -d1 all contemplate that cities may have surplus earnings over the amount necessary to meet the statutory demands and provide for the disposition of such surplus earnings.

Section 6134-d1 states that cities shall have power to pay for a utility plant out of its *past earnings* or out of future earnings.

Section 6151-b1 provides that if the original purchase bonds are paid or an adequate sinking fund has been provided for the payment of such bonds the city may, with the approval of the state comptroller, transfer surplus earnings in excess of the amount required to retire bonds and interest due in the current year and succeeding year for the purpose of retiring general bonded indebtedness of the city which is payable by general taxation or for the purpose of making any municipal improvement authorized by law.

Section 6151-b2 provides that cities having a surplus earned from utility plants and having no bonded indebtedness against the plant or which has sufficient funds on hand to provide for the current and succeeding year's principal and interest may transfer such surplus earnings to any other fund with the approval of the comptroller. The other sections above referred to contain additional provisions for transferring and the disposition of surplus earnings.

Section 6142, chapter 312, provides that the city:

"* * * shall, from time to time in such manner as they deem equitable, assess upon each tenement or other place supplied with heat, water, gas, light, or power, reasonable rents or rates fixed by ordinance, and shall levy a tax as provided by law to pay or aid in paying the expenses of running, operating, renewing, and extending such works, and the interest on any bonds issued to pay all or any part of their construction."

Section 6134-d2 requires that the contract for the construction of a utility plant shall specify the maximum rate that may be charged consumers and that the city shall not increase or fix any rate beyond such maximum. The rates must be reasonable and not in excess of the maximum rate specified in the contract. In this case the rate did not exceed the maximum rate fixed in the contract and there is no presumption that the rates fixed were unreasonable. However, the defendants are not here as a user of electricity alleging that the rates are unreasonable, but are claiming the city is without power to make a profit. We find nothing in the case of Saltzman v. City of Council Bluffs, supra, that is not in harmony with the conclusion we reach here that the city had the statutory power to make profits in excess of the statutory demands.

Defendants' argument that the record does not show that the city has the right to transfer surplus earnings under the provisions of the above statutes and therefore cannot be compelled to respond in damages to the city is untenable. The inquiry here is the right to make surplus profits, not the right to transfer such profits.

We quote from a recent article in 43 Yale Law Review, page 924, on Administration of Municipal Credit:

"In addition to resorting to new objects of taxation many Cities have utilized their municipally owned utilities as an important source of revenue. In some jurisdictions state commissions, empowered to regulate the rates of cities' utilities as well as those of privately owned companies, have limited the cities to a return either sufficient only to pay actual costs or equal only to that allowed utilities privately owned. But where neither commission nor statute imposes restrictions, there appears to be no limits upon the power of municipalities to divert profits from

their own utilities thereby to lower the general tax level. Several Legislatures have in recent years restricted such diversions.'' (Referring to the Iowa Statutes.)

In this state the legislature requires rates to be reasonable and if there is a construction contract they must not exceed the maximum rate fixed therein. The right to transfer funds is subject to the restrictions contained in the above statutes.

Defendants' proposition that a city cannot make a profit in the operation of its utilities above the statutory demands cannot be sustained.

We have examined other assignments relating to the admission of evidence, and, finding no error, the case is affirmed.— Affirmed.

KINTZINGER, RICHARDS, ANDERSON, and HAMILTON, JJ., concur.