# IN THE SUPREME COURT OF IOWA
No. 23–0239
Submitted March 21, 2024—Filed April 26, 2024

**THE UNIVERSITY OF IOWA, BOARD OF REGENTS,** and **STATE OF IOWA,**

Appellants,

vs.

**MODERN PIPING, INC.,**

Appellee.

---

Appeal from the Iowa District Court for Johnson County, Chad A. Kepros, Judge.

Party which obtained a temporary injunction that was subsequently dissolved appeals judgment ordering payment of restitution for wrongful injunction. **AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

Oxley, J., delivered the opinion of the court, in which all justices joined.

Brenna Bird, Attorney General; Tessa M. Register (argued) (until withdrawal), Assistant Solicitor General; and Ryan Sheahan, Assistant Attorney General, for appellants.

Mark E. Weinhardt (argued) and Danielle M. Shelton of The Weinhardt Law Firm, Des Moines, and Jeffrey A. Stone and Erin R. Nathan of Simmons Perrine Moyer Bergman PLC, Cedar Rapids, for appellee.

**OXLEY, Justice.**

The University of Iowa Stead Family Children's Hospital overlooking Kinnick Stadium is a proud landmark in Iowa City known nationwide for the "Kinnick wave"—a tradition since 2017 where, at the end of the first quarter of every home Iowa Hawkeye football game, the nearly 70,000 fans, players, coaches, referees, and opponents inside Kinnick Stadium turn to wave at the patients and families in the top floors of the Children's Hospital.[1] Although its landmark status is now settled, construction of the Children's Hospital did not go smoothly. This case involves one of the construction disputes—at least at the periphery—between the University of Iowa and Modern Piping, Inc., the mechanical contractor for the project.

The case started with Modern Piping's attempt to settle some of the parties' construction disputes. Modern Piping wanted to arbitrate some delay disputes; the University did not. The University obtained an ex parte temporary injunction that prohibited the American Arbitration Association (AAA) from arbitrating specific disputes presented by Modern Piping. Modern Piping intervened and got the temporary injunction dissolved. The University appealed, but it was unsuccessful. Meanwhile, the parties arbitrated the original disputes, and the University paid Modern Piping over $16 million pursuant to the arbitration award.

But this appeal is not about arbitration. It is about damages available to a party who, like Modern Piping, is enjoined by a court order that is later determined to have been wrongfully entered. After the University lost its appeal about the validity of the injunction, Modern Piping attempted to recover not only the fees and costs it incurred in dissolving the injunction, but also the restitution

---

[1]*See* Patrick Basler, *Opponents Are Joining Iowa in Doing the Kinnick Wave*, SB Nation, www.sbnation.com/lookit/2017/10/7/16441398/illinois-iowa-football-kinnick-wave [https://perma.cc/V7GS-99TZ] (Oct. 7, 2017, 1:40 PM).

it claimed was necessary to avoid unjustly enriching the University for its actions. What started as a request for fees and costs, for which Modern Piping was eventually awarded just over $21,000, turned into a jury verdict also awarding Modern Piping over $12.7 million of the University's profits in operating the Children's Hospital during its first eight months.

As explained below, the restitution awarded here is not a proper remedy for a claim for wrongful injunction and cannot stand. The judgment is affirmed in part and reversed in part. The $21,784.50 award to Modern Piping for fees and costs is affirmed, and the $12,784,177.00 award for restitution is reversed.

I.

Modern Piping is a Cedar Rapids construction contractor that entered separate contracts in August and September 2013, respectively, to serve as the mechanical contractor for two large projects on the University campus in Iowa City. The first contract involved the construction of the fourteen-story Children's Hospital adjacent to the University of Iowa Hospitals and Clinics that overlooks Kinnick Stadium. Construction of the Children's Hospital was an almost $330 million project, and Modern Piping's mechanical contract accounted for just over $28 million. The second contract involved replacing the 1,800-seat Hancher Auditorium following the 2008 flood. Replacement of Hancher was an approximately $176 million project, and Modern Piping's mechanical contract was over $11 million.

Both contracts included "general conditions of the contract" with identical arbitration provisions. Under the contract, arbitration of disputes became mandatory once a party referred the dispute to the design professional.[2] On February

---

[2]The "design professional" is the person generally tasked with advising and consulting with the owner of the project. He has the authority to interpret the contract documents and make recommendations when there is a dispute between the owner and contractor.

27, 2015, Modern Piping filed a claim with the AAA related to what turned into approximately $1.6 million worth of claimed delays in the Hancher project. The University challenged arbitrability, Modern Piping brought a claim in district court to enforce arbitration, and the court ordered the parties to arbitrate on February 16, 2016.

On March 23, Modern Piping filed an amended claim with the AAA seeking to add claims related to the Children's Hospital to the pending Hancher arbitration proceeding. The Children's Hospital disputes totaled over $8 million and similarly related to claimed delays and schedule compression, congestion, and out-of-sequence construction. The University refused to consent to arbitrating the Children's Hospital disputes as part of the pending Hancher arbitration.

On April 1, the University filed an ex parte petition in district court against the AAA. The only relief it sought was a temporary and permanent injunction enjoining the AAA from adding the Children's Hospital claims to the Hancher arbitration proceedings. To support its request for an immediate temporary injunction, the University asserted that being forced to arbitrate a dispute over an unrelated project would require it "to direct resources from the completion of the time sensitive Children's Hospital Project to arbitrate a matter not properly before the AAA." The petition named the AAA as a defendant but not Modern Piping. The same day, the district court issued a temporary injunction pursuant to Iowa Rule of Civil Procedure 1.1507, which allows entry of an injunction without prior notice to the enjoined party. The injunction ordered that the AAA "is temporarily enjoined from presenting the dispute over the Children's Hospital Project to arbitration until further action from the Court." The AAA answered the petition on May 20 but did not otherwise seek to lift the injunction.

Seven months later, Modern Piping filed a motion to intervene and a motion to dissolve the temporary injunction on November 2. Modern Piping was

allowed to intervene, and on January 10, 2017, the district court dissolved the temporary injunction on the basis that the AAA—the only named defendant—was protected by arbitral immunity as argued by Modern Piping.

In June 2016—after the temporary injunction was granted in April and before it was lifted the following January—the University sought to use and occupy a portion of the Children's Hospital, although construction was not complete. Partial occupancy was contemplated by section 9.7.1 of the general conditions, which provided that "[t]he Owner may occupy or use any completed or partially completed portion of the Work at any stage when such portion is designated by separate agreement with the Contractor." The contract required the parties to assign responsibilities between them for such things as maintenance, utilities, damage to the work, and insurance, and it provided that the contractor could not unreasonably withhold consent. Modern Piping attempted to reach an agreement concerning partial occupancy with the University, but the University refused to enter into the separate agreement required by the general conditions. The University nonetheless partially occupied certain floors of the Children's Hospital that were substantially complete before the entire construction project was completed. The University began preparing and furnishing the facility with needed technology, equipment, and other supplies starting in June 2016, which in turn allowed the University to start accepting patients in the new facility in February 2017, eight months earlier than it otherwise would have absent the early use and occupancy. Construction of the Children's Hospital was completed in May 2017.

Back at the AAA, an arbitration panel had been appointed and confirmed to arbitrate Modern Piping's Hancher claims on October 27, 2016. The arbitration panel recognized that Modern Piping's claims related to the Children's Hospital were on hold until the panel received notice on February 1, 2017, that

the temporary injunction had been dissolved. The panel was then able to proceed with respect to both the Hancher and the Children's Hospital disputes presented by Modern Piping in its amended statement of claims. By this time, the University had been occupying parts of the Children's Hospital for several months without entering into a separate agreement with Modern Piping, but Modern Piping did not submit that breach of contract claim to the Design Professional or otherwise attempt to arbitrate with respect to the University's partial occupancy. The panel heard testimony from fifteen witnesses over nine days in September 2017 about the delays related to both projects and was provided with approximately one thousand exhibits. On March 5, 2018, the arbitration panel issued a final award to Modern Piping in the amount of $21,493,129.91, plus interest. Of that award, $16,334,135.40 related to claims concerning the Children's Hospital, stemming primarily from significant labor inefficiencies outside of Modern Piping's control and an "inordinate number of [design] changes . . . made throughout the project." In addition, the award included prejudgment interest of $930,000, attorney fees and expenses over $416,000, and nearly $500,000 in costs and expenses of the arbitration proceeding. The arbitration award was confirmed by a district court and affirmed on appeal. *See Mod. Piping, Inc. v. Bd. of Regents ex rel. Univ. of Iowa*, 2019 WL 1494649, at *2 (Iowa Ct. App. Apr. 3, 2019). Modern Piping filed a satisfaction of judgment reflecting full payment of the award on June 13, 2019.

In the district court case involving the University's request for an injunction against the AAA, the district court dissolved the temporary injunction on January 10, 2017, on the basis of arbitral immunity. On March 17, the AAA sought summary judgment to dismiss the University's petition for a permanent injunction on the same basis. The district court granted summary judgment to the AAA on April 27, dismissing all of the University's claims. On May 8, the

University filed postjudgment motions, and Modern Piping filed a motion for attorney fees and costs incurred in dissolving the temporary injunction. The district court denied the postjudgment motions on May 30 and set Modern Piping's motion for fees and costs for hearing on July 19. The University appealed the district court's summary judgment order on June 15, which the court of appeals affirmed on January 9, 2019. *Univ. of Iowa v. Am. Arb. Ass'n*, 2019 WL 141003, at *2 (Iowa Ct. App. Jan. 9, 2019). Modern Piping's May 8, 2017 motion for fees and costs remained pending during the appeal. The University had requested a continuance based on a conflict with the scheduled July 19 hearing, and the district court granted the continuance without resetting a hearing. Neither party asked the court to hear the motion during the pendency of the appeal.

After procedendo issued following the appeal, the district court entered an order on March 11, 2019, noting the outstanding motion for fees and costs and inviting the parties to identify any remaining issues. Modern Piping filed a motion for leave to add a counterclaim, noting its motion for fees and costs was still pending and asserting that its "claim for wrongful injunction has now ripened." Modern Piping asserted it was entitled to recover for the harm it suffered while the temporary injunction was in place, "including without limitation delays to the arbitration, attorneys' fees and related costs to obtaining the dissolution of [the University's] wrongful injunction, and other damages." It also made a demand for a jury trial.

The proposed counterclaim alleged that Modern Piping had filed a demand for arbitration with the AAA on March 23, 2016, for claims involving the Children's Hospital project that it had referred to the Design Professional, and the University refused to participate in arbitration. It alleged that the district court temporarily enjoined the AAA from arbitrating those claims with the pending Hancher arbitration. It also alleged that after the temporary injunction

was dissolved on January 10, 2017, the parties proceeded with the arbitration on all claims that had been referred to the Design Professional, resulting in an award to Modern Piping of $21,493,129.91 plus interest. It then alleged that "Modern Piping was harmed by the wrongful *ex parte* injunction [the University] obtained for the time period between April 1, 2016, through January 10, 2017, resulting in damages, delays to the arbitration, attorneys' fees and related costs to obtaining the dissolution of [the University's] wrongful injunction, and other damages." Modern Piping sought damages "including without limitation compensatory, consequential, and restitutionary . . . damages[,] attorneys' fees and expenses that it incurred . . . , interest, court costs, and any other relief that is just and appropriate."

Over the University's resistance, the district court allowed Modern Piping to add the counterclaim. The district court recognized that a ruling on Modern Piping's motion for fees and costs was still outstanding and that some jurisdictions allow a claim for wrongful injunction to be asserted within the injunction suit itself. The district court acknowledged the University's argument that Modern Piping's claim was a tort claim analogous to a claim for abuse of process precluded by immunity under Iowa Code § 669.14(4) (2019), characterizing Modern Piping's counterclaim as one "for damages pertaining to delay in arbitration based on a wrongful injunction consistent with an abuse of process theory." Nonetheless, it concluded "that Modern Piping should be allowed to bring this claim, to the extent it is an actual counterclaim, in order to resolve the costs, attorney fees and damages resulting directly from the injunction sought and then dissolved by the [University] in this case."

The University subsequently filed a motion for partial summary judgment with respect to the appropriate measure of damages for Modern Piping's wrongful injunction counterclaim. The University sought a ruling that Modern Piping's

requests for consequential and restitutionary damages were beyond the scope of damages allowed in a claim for wrongful injunction. In its resistance to summary judgment, Modern Piping argued that as a legal matter restitution is a proper remedy for a wrongful injunction. And it argued that as a factual matter the University's temporary injunction prevented Modern Piping not only from arbitrating the Children's Hospital disputes it had submitted for arbitration, but also from litigating any of its contractual rights related to the Children's Hospital during the pendency of the temporary injunction for risk of waiving its ability to arbitrate such claims, causing Modern Piping to suffer substantial damages. The substantial damages identified by Modern Piping included those stemming from its alleged inability to enforce other contractual rights. Specifically, Modern Piping asserted that the University took advantage of the temporary injunction by breaching the partial use and occupancy provision of the general conditions of the parties' contract to open the Children's Hospital before construction was complete without entering the separate agreement required by the general conditions. Modern Piping argued that the University had been unjustly enriched and that Modern Piping was entitled to restitution in the form of disgorgement of the University's profits earned from the early occupancy.

The district court denied the University's motion for summary judgment, concluding that the jury should be allowed "to consider Modern Piping's allegations that imposition of the injunction delayed Modern Piping's ability to enforce its contractual rights, as well as its ability to litigate its disputes with the state."

The University also consistently challenged Modern Piping's wrongful injunction claim as the functional equivalent of a claim for abuse of process, from which the state is immune under Iowa Code § 669.14(4). In rejecting the University's postdiscovery motion to dismiss on the basis of sovereign immunity, the district court concluded that a wrongful injunction claim is not functionally

equivalent to abuse of process because the claims have different intent elements: "[T]here is no requisite mental state to be considered in a wrongful injunction claim, whereas an abuse of process claim focuses on a defendant's purpose in bringing an action."

Modern Piping's claim for wrongful injunction was tried to a jury in October 2022. During the three-day trial, Modern Piping's evidence focused almost exclusively on the University's partial occupancy of the Children's Hospital. Its senior executive project manager and minority owner, Mike Shive, testified about the additional work required of Modern Piping from the University's early occupation of the Children's Hospital. To that end, much of Shive's testimony focused on the University's bad faith in refusing to negotiate a partial occupancy agreement with Modern Piping. Shive testified that his University counterparts, including electrical and mechanical project manager Jason Miller, refused to even discuss the partial occupancy matter with him. Modern Piping introduced emails from University officials identifying the temporary injunction as "good news," that "[i]t would take a hearing in Johnson County Court to change this order," and "it is imperative that Heery, the Design Professional, not accept nor analyze any claims submitted by Modern Piping." Another email discussed Miller's view that "Modern [Piping] . . . should be put out of business with the way they handled this project." On cross-examination, Shive admitted that the temporary injunction itself did not prevent the parties from entering into a partial occupancy agreement.

Modern Piping also presented testimony from a legal expert who opined about the injunction's wrongfulness and the harm caused to Modern Piping as a result. Much of the legal expert's testimony concerned the University's motivation for seeking the injunction, which he opined was the University's desire to move into the unfinished Children's Hospital without having to first

arbitrate a partial occupancy agreement. This improper purpose for obtaining the temporary injunction laid the foundation for his professional opinions that the temporary injunction was wrongful, the injunctive order empowered the University to partially occupy the unfinished Children's Hospital, and the early occupancy prevented Modern Piping from arbitrating the partial occupancy dispute like it normally would have done, causing lost contract damages to Modern Piping and benefiting the University. Similar to Shive's testimony, the legal expert testified on cross-examination that the temporary injunction did not preclude the parties from entering an agreement on the partial occupancy issue and that Modern Piping could have submitted the early occupation issue to arbitration after the temporary injunction was dissolved in January 2017, but it was not required to do so.

Modern Piping's economic expert testified that the University received an additional profit of $12,784,177 because it was able to accept patients eight months earlier than if it had not partially occupied the Children's Hospital. He also testified that had the parties negotiated an agreement for partial occupancy pursuant to the general conditions, then Modern Piping would have submitted a bid for $2,502,068, which he characterized as the additional risk associated with completing its work while the University was partially occupying the Children's Hospital.

Prior to and during trial, the University raised numerous objections to evidence concerning its improper purpose in obtaining the injunction, which it argued was not relevant to establishing the injunction's wrongfulness and effectively allowed Modern Piping to try its wrongful injunction claim as an abuse of process claim against the state. The district court rejected the University's arguments based on its understanding that "the purpose, if it's improper, of the injunction is relevant to that finding of wrongfulness."

Also over the University's objection, the district court instructed the jury on Modern Piping's wrongful injunction claim using an unjust enrichment theory premised on providing restitution to Modern Piping based on the benefit it conferred on the University from the wrongful injunction to avoid unjustly enriching the University. The jury found for Modern Piping, concluding that the University was "unjustly enriched due to the wrongful injunction" in the amount of $12,784,177 and that "the reasonable and necessary costs, expenses, and attorney's fees expended by Modern Piping to dissolve the wrongful injunction" totaled $21,784.50.

## II.

The University appealed, and we retained the appeal. The University raises a number of issues on appeal, but we believe only two issues need to be addressed in resolving the appeal.

## A.

Because a district court's actions beyond its jurisdiction are void, *see Wederath v. Brant*, 287 N.W.2d 591, 595 (Iowa 1980) (en banc) ("The effect of action taken by a court without jurisdiction of the subject matter is that the action is void."), we first address the University's jurisdictional argument. The University challenges the district court's jurisdiction to proceed with Modern Piping's wrongful injunction counterclaim following the court of appeals opinion affirming dismissal of its claims in the underlying case. As a general matter, a district court lacks authority to decide new issues raised following affirmance of a final order. *See Franzen v. Deere & Co.*, 409 N.W.2d 672, 675 (Iowa 1987) (en banc) (holding that defendant's "application to impose rule 80(a) sanctions, filed . . . after we affirmed the final judgment of the district court . . . , was filed too late to give the district court authority to consider it"). But Modern Piping's motion for fees and costs was filed before the appeal was taken, and the district

court allowed Modern Piping to add the counterclaim under the theory that it was seeking ancillary relief, essentially the same relief Modern Piping had requested in the pending motion for fees and costs. Motions for fees and costs are ancillary, and a district court's authority to rule on such motions is an exception to the tenet that a notice of appeal divests the district court of jurisdiction over the case. *See State v. Mallett*, 677 N.W.2d 775, 776–77 (Iowa 2004) ("Generally, an appeal divests a district court of jurisdiction . . . . However, a district court maintains jurisdiction over disputes between the parties that are merely collateral to the issues on appeal.").

Modern Piping's motion for costs and fees had been continued and was still pending when the case returned to the district court following the appeal, and that motion's continuance supported the district court's conclusion that Modern Piping's postappeal pleading merely built on the pending motion. As the district court recognized, courts vary on treating wrongful injunction damages as ancillary to the underlying case or as a separate cause of action. *See, e.g.*, 42 Am. Jur. 2d *Injunctions* § 317, at 925–26 (2020) (discussing cases). While Modern Piping's claim for what started out as a request for ancillary relief morphed over time, the district court was not without jurisdiction over the claim.

B.

This appeal turns on the scope of the damages an enjoined party is allowed to recover when it turns out that the injunction should not have been issued. In addition to the attorney fees and costs incurred in obtaining dissolution of the temporary injunction, Modern Piping also claimed that it was entitled to restitution from the University for the benefit the University received when it wrongfully obtained the temporary injunction. Modern Piping's logic goes like this: Restitution is an appropriate remedy for a wrongful injunction; restitution is a form of

damages for unjust enrichment; and unjust enrichment allows for the disgorgement of the enriched party's profits. The University argues on appeal (as it did throughout the district court proceedings) that the type of unjust enrichment Modern Piping sought and obtained is not available for the wrongful injunction at issue in this case.

The law has long been "settled in this state that, when an injunction is the only relief sought and the temporary writ issued therein is dissolved on final hearing, recovery by the defendant may be had for the reasonable and necessary costs, expenses, and attorney fees expended in procuring such dissolution." *Chrisman v. Schmickle*, 230 N.W. 550, 551 (Iowa 1930); *see also Burnett v. N. M. Stark & Co.*, 136 N.W. 670 (Iowa 1912) ("It is well settled that where an injunction is the sole relief sought, and a temporary writ is executed and afterwards dissolved, then the defendant in such injunction suit is entitled to recover upon the injunction bond his necessary costs and expenses in obtaining such dissolution including attorney fees."); *Weierhauser v. Cole*, 109 N.W. 301, 302 (Iowa 1906) ("Under the circumstances, where injunction is the sole relief sought, we have often held that its dissolution, either by interlocutory order or upon the final hearing, entitles the party enjoined to recover his attorney's fees in resisting the writ."). The parties do not dispute that the attorney fees and costs Modern Piping incurred in successfully getting the temporary injunction dissolved are proper damages for the wrongful injunction. Indeed, the University did not appeal from the $21,784.50 verdict awarded by the jury for those costs and fees. The issue is whether Modern Piping is entitled to additional damages, which requires us to consider what types of damages are available for a wrongful injunction beyond the costs and fees incurred in getting the injunction dissolved.

Courts have generally recognized two distinct causes of action for a wrongful injunction: "one upon bond ordinarily filed to obtain a temporary

restraining order or injunction, and the other for malicious prosecution." 43A C.J.S. *Injunctions* § 498, at 544 (2014) ("[T]he two actions differ in the kind of wrong that must be shown to establish liability and in the amount of recovery."). Regarding the first type of action, the general rule requires that the injunction was either wrongful in its inception or that it continued owing to some wrong on the part of the plaintiff in order to recover damages. *See id.* § 502, at 547. Although courts retain equitable discretion in determining the amount, only those damages actually sustained because of the injunction should be allowed. *See id.* § 515, at 561–62. In contrast, punitive or other excess damages based on a wrongful injunction are limited to actions for malicious prosecution or abuse of process, both of which require additional proof of an enjoining party's malicious intent or improper purpose in obtaining the temporary injunction. *See id.* § 515, at 562; *see also Wilson v. Hayes*, 464 N.W.2d 250, 260–61, 266 (Iowa 1990) (en banc) (involving claims for malicious prosecution and abuse of process and discussing both as a cause of action). Our caselaw addressing wrongful injunction claims is consistent with these general principles of law.

In addition to costs and fees for obtaining the dissolution of a wrongful injunction, we have recognized that "damages that were the natural and proximate result of the wrongful injunctions" could be recovered in a claim against an injunction bond. *City of Corning v. Iowa–Neb. Light & Power Co.*, 282 N.W. 791, 794 (Iowa 1938). In *City of Corning v. Iowa–Nebraska Light & Power Co.*, the defendant had previously obtained a temporary injunction to prevent the City of Corning from constructing a competing municipal light and power plant. *Id.* at 792. The injunction was soon dissolved, and the city successfully defended Iowa–Nebraska's challenge to the dissolution on appeal. *Id.* at 792–93. However, the temporary injunction and bonded appeal stays prevented the city from moving forward with its construction efforts for nearly a year. *Id.* The city

sued on the bonds, and Iowa–Nebraska claimed the city's damages should be limited to those incurred only while the injunction and appeal stay were in place. *Id.* at 794. Our court held that the city "was entitled to compensation for damages that were the natural and proximate result of the wrongful injunctions and was not necessarily limited to a recovery of damages while the injunctions were in force if the damages flowing directly from the injunctions continued for a period of time beyond the date of their dissolution." *Id.* We adopted "[t]he measure of damages in a case of this kind" from a leading treatise: "In determining the amount of damages to be allowed upon the dissolution of an injunction *restraining one from exercising acts of ownership over his real property*, . . . the defendant [is] entitled to such damages as are the necessary and proximate result of such deprivation." *Id.* (emphasis added and omitted) (quoting 2 James L. High, *A Treatise on the Law of Injunctions* § 1673 (4th ed. 1905) [hereinafter High, *Injunctions*]). Where the injunctions directly precluded the city from building its power plant, the profits it would have earned from the power plant were "the necessary and proximate result of such deprivation." *Id.* (emphasis omitted) (quoting High, *Injunctions* § 1673).

The recovery of damages when a party wrongfully obtains an injunction is analogous to the recovery of money paid or property transferred in compliance with a judgment that is reversed on appeal. *See Schwennen v. Abell*, 471 N.W.2d 880, 884 (Iowa 1991) ("adopt[ing] the Restatement rule for voluntary payment cases involving reversed judgments" where a defendant paid a judgment to avoid accruing additional interest pending appeal). In that context, "[a] person who has conferred a benefit upon another in compliance with a judgment, or whose property has been taken thereunder, is entitled to restitution if the judgment is reversed or set aside . . . ." *Id.* at 883 (quoting Restatement (First) of Restitution: Quasi Conts. & Constructive Trs. § 74, at 302–03 (Am. L. Inst. 1937)).

Modern Piping relies on the related provision from the updated Restatement (Third) of Restitution and Unjust Enrichment to argue it is entitled to restitution because the injunction was reversed. Section 18 of Restatement (Third) provides: "A transfer or taking of property, in compliance with or otherwise in consequence of a judgment that is subsequently reversed or avoided, gives the disadvantaged party a claim in restitution as necessary to avoid unjust enrichment." 1 Restatement (Third) of Restitution & Unjust Enrichment § 18, at 244 (Am. L. Inst. 2011) [hereinafter Restatement (Third)]. From there, Modern Piping argues that it was entitled to seek disgorgement of the University's profits by quoting from *State ex rel. Palmer v. Unisys Corp.*, where we said: "Restitution measures the remedy by the gain obtained by the defendant . . . and seeks disgorgement of that gain." 637 N.W.2d 142, 153 (Iowa 2001). But stringing together quotes from cases involving restitution in different contexts does not support Modern Piping's position.

Restitution takes many forms. *See, e.g., Unisys*, 637 N.W.2d at 156 ("Subrogation, like contribution and indemnity, is a separate form of restitution."). As stated in the Restatement (Third) sections that Modern Piping relies on: "The usual consequence of a liability in restitution is that the defendant must restore the benefit in question or its traceable product, or else pay money in the amount necessary to eliminate unjust enrichment." Restatement (Third) § 1 cmt. *a*, at 3. "Conversely, there are cases in which the remedy for unjust enrichment gives the plaintiff something—typically, the defendant's wrongful gain—that the plaintiff did not previously possess." *Id.* § 1 cmt. *a*, at 3–4. In acknowledging that restitution is essentially the law of unjust enrichment, the Restatement (Third) notes this is merely a "term of art," and the substantive portion of restitutionary law "is concerned with identifying those forms of enrichment that the law treats as 'unjust' for purposes of imposing liability." *Id.* § 1 cmt. *b*, at 4.

But "[t]he concept of unjust enrichment is not a judicial remedy to correct perceived injustices, unfairness, or inequities in a broad sense. Rather, the doctrine involves a 'narrower set of circumstances giving rise to what might more appropriately be called unjustified enrichment.' " *Livingood v. City of Des Moines*, 991 N.W.2d 733, 749 (Iowa 2023) (quoting Restatement (Third) § 1 cmt. *b*, at 4). Both parties rely on *Unisys*, where we expounded on the doctrine of unjust enrichment "as a basis for restitution." 637 N.W.2d at 154. While we "recognize[d that] unjust enrichment is a broad principle with few limitations," *id.* at 155, we also said it was critical to understand "the true nature of the claim" underlying a claim for unjust enrichment, *id.* at 156.

In *Unisys*, the claim was "actually one for equitable subrogation." *Id.* at 156. The state had contracted with Unisys to calculate the capitation rate the state used to pay health maintenance organizations (HMOs), including Heritage, to provide services under the Medicaid program. *Id.* at 147–48. Unisys made a mistake in its calculations that resulted in overpayments to the HMOs to the tune of $15 million in 1994 and $17.5 million in 1995. *Id.* at 148. The state sued Unisys for breach of contract, and Unisys brought a third-party claim for unjust enrichment against Heritage (and other HMOs) on the basis that Heritage should not be allowed to retain the overpayments—even though the state did not seek recoupment from Heritage. *Id.* at 147, 149. In considering Unisys's claim for unjust enrichment, we considered whether restitution was equitable by applying rules of subrogation—when one party is "compelled to pay a debt that ought to have been paid by another." *Id.* at 156 (quoting *Am. Sur. Co. of N.Y. v. Bethlehem Nat'l Bank of Bethlehem*, 314 U.S. 314, 317 (1941)). In that context, we concluded Unisys should be allowed to pursue a claim for unjust enrichment against Heritage to the extent Unisys made payment to the state on its breach of contract

claim and that payment would satisfy Heritage's obligation to pay restitution to the state in the amount Heritage had been overpaid. *Id.* at 156–57.

We believe Modern Piping led the district court astray when it convinced the court that its claim for wrongful injunction entitled it to recover restitution in the form of a broad-reaching unjust enrichment claim, and restitution should be measured as the disgorgement of the benefit provided to the University. As in *Unisys*, it is critical that we consider the "true nature of the claim," *id.* at 156, that Modern Piping is making against the University.

The type of restitution addressed in wrongful injunction claims, like the restitution available when a judgment is reversed on appeal, is limited to restoring the enjoined party to that which it lost as a direct result of the injunction. In the context of a reversed judgment, the Restatement (Third) recognizes restitution as a proper remedy to the extent of "[a] transfer or taking of property, in compliance with or otherwise in consequence of a judgment that is subsequently reversed or avoided." Restatement (Third) § 18, at 244. Thus, when the defendant in *Schwennen v. Abell* paid a money judgment to avoid accruing additional interest, he was entitled to have the money he had paid restored to him when the judgment was reversed on appeal—a manner of restitution. *See* 471 N.W.2d at 883–84. In *Arkadelphia Milling Co. v. St. Louis Southwestern Ry.*, the United States Supreme Court similarly explained that a party "is entitled, in the event of a reversal, to be restored by his adversary to that which he has lost thereby." 249 U.S. 134, 145–46 (1919). So when rail carriers were allowed to charge excess rates during the time that an injunction precluded the Railroad Commission of Arkansas from enforcing its commission rates, requiring the carriers to repay the excess charges was "a typical case for the application of the principle of restitution." *Id.* In this context, restitution restores the parties to the status quo that existed prior to entry of the injunction.

Modern Piping argues that—the language of the Restatement (Third) notwithstanding—disgorging the benefit provided to the enjoining party is also a proper remedy for a wrongful injunction. There are instances where courts recognize this type of restitutionary remedy for a wrongful injunction, but those are tightly circumscribed. One instance is when the enjoining party obtains a benefit by competing with the enjoined party. For example, when "a preliminary injunction [is] issued to protect a patent that is eventually declared invalid, [the injunction] provid[es] the plaintiff with an unwarranted monopoly status during the litigation." Ofer Grosskopf & Barak Medina, *Remedies for Wrongfully-Issued Preliminary Injunctions: The Case for Disgorgement of Profits*, 32 Seattle U. L. Rev. 903, 912 (2009) [hereinafter Grosskopf & Medina]; *see also Fleer Corp. v. Topps Chewing Gum, Inc.,* 539 A.2d 1060, 1063 (Del. 1988) ("Because of the injunction issued by the District Court, Fleer was able to legally appropriate Topps' property rights and market baseball trading cards, an action which would have clearly infringed on Topps' exclusive rights except for the District Court's order."). Modern Piping's attempt to reach the University's profits from operating the Children's Hospital turns this theory on its head. Under no set of circumstances would a mechanical contractor be entitled to the profits of the business occupying the building it is constructing.

Another instance "involves benefits generated by enjoining the use of the defendant's powers, such as tax collection, or enforcement of price or wage control." Grosskopf & Medina, 32 Seattle U. L. Rev. at 912 (footnote omitted). *Arkadelphia* is an example of this type of restitution. *See* 249 U.S. 134. The rail carriers were only able to extract the excessive charges from their customers because the commission was enjoined from enforcing its commission rates. *Id.* at 145–46. Other regulatory cases follow suit. *See, e.g., Panhandle E. Pipe Line Co. v. Fed. Power Comm'n,* 154 F.2d 909, 912 (8th Cir. 1946) (holding that a

pipeline, which overcharged for natural gas while its challenge to the Federal Power Commission's reduced-rate order was on appeal, was required to reimburse customers for overpayments and to also pay the expense of distributing the overpayments); *see also Middlewest Motor Freight Bureau v. United States*, 433 F.2d 212, 228 (8th Cir. 1970) (describing the *Panhandle Eastern Pipeline Co. v. Federal Power Commission* decision as "consistent with the general principle that a party who obtains a benefit from an improperly issued injunction has the duty to restore that benefit to those who have been injured by the injunction").

In the context of wrongful injunctions, "[r]estitution is available almost exclusively in cases in which a sum of money or a specific property had been transferred from the defendant to the plaintiff on the basis of the preliminary injunction; thus, only 'restitution in kind' or 'money had and received' is available." Grosskopf & Medina, 32 Seattle U. L. Rev. at 910 & n.32 (citing cases and describing "the remedy of restitution for wrongfully-issued preliminary injunctions [as] very limited"); *see also St. Louis Sw. Ry. of Tex. v. Consol. Fuel Co.*, 260 F. 638, 640 (8th Cir. 1919) (holding, in a case where a preliminary injunction required the defendant to supply coal to the plaintiff: "It would be a grave reproach to the administration of justice if, when a court has wrongfully taken the property of one party and given it to another, it should be powerless to make restitution. The law is otherwise."); Dan B. Dobbs, *Should Security be Required as a Pre-Condition to Provisional Injunctive Relief?*, 52 N.C. L. Rev. 1091, 1141–42 (1974) (arguing that caselaw "may suggest not only that restitution will be denied unless the plaintiff's gains are traceable to and identifiable with the defendant's losses, but also that the gains must be directly traceable"). "Indeed, all thirty-two illustrations given by the Reporters of the Restatement of Restitution are cases in which 'money has been paid' or 'property has been

transferred.' " Grosskopf & Medina, 32 Seattle U. L. Rev. at 910. This limited application is reinforced by section 18 of the Restatement (Third), which recognizes that restitution applies only to "[a] *transfer or taking of property*, in compliance with or otherwise in consequence of a judgment." Restatement (Third) § 18, at 244 (emphasis added).

Focusing on "the true nature of the claim" sought by Modern Piping, *Unisys*, 637 N.W.2d at 156, restitution in the context of a wrongful injunction requires a direct correlation between the matter being enjoined and the claimed harm. *See Bryant v. Mattel, Inc.,* 2010 WL 11463865, at *8 (C.D. Cal. Oct. 5, 2010) ("None of the case law on this issue allows a wrongfully enjoined party to recover all 'unjust enrichment' caused by the injunction. Most of the cases instead limit recovery to amounts compelled to be transferred by the injunction itself."). That direct correlation is lacking here. Modern Piping argues that the University used the temporary injunction to take partial occupancy of the Children's Hospital without entering into the separate agreement with Modern Piping required by the general conditions. But the temporary injunction addressed only those claims Modern Piping had already submitted for arbitration, which did not include the partial occupancy issue. The injunction precluded the AAA (and by default Modern Piping) from arbitrating the claims Modern Piping had submitted for arbitration related to the Children's Hospital project in the same proceedings Modern Piping was arbitrating its Hancher claims. Nothing more, nothing less. The temporary injunction did not transfer or take any of Modern Piping's arbitration claims from it. The injunction merely delayed the timing of the arbitration proceedings. Indeed, the AAA arbitrated all the claims Modern Piping had submitted for arbitration beginning in March 2017, once the temporary injunction was dissolved. Arguably, the interest accrued during the time period the arbitration claims were delayed would have a direct correlation to the injunction, but

the amount awarded by the AAA included prejudgment interest that covered that loss. The temporary injunction made no mention of any other breach of contract claims that Modern Piping might have against the University but had not submitted for arbitration. Rather, the terms of the temporary injunction related only to the arbitration claims.

Modern Piping tries to create a direct correlation between the partial occupancy and the injunction by characterizing the University's refusal to enter a partial occupancy agreement as taking Modern Piping's property right to exclude all others. But Modern Piping misstates its "property" right with respect to the Children's Hospital in making this argument. Modern Piping had a contractual right to additional compensation for the University's partial occupancy, not a property right to exclude the University. The University owned the building, and Modern Piping was the mechanical contractor, one of several contractors working to construct the Children's Hospital. This is not the type of situation at issue in *City of Corning* where the owner was prevented by a wrongful injunction from constructing a competing power plant and lost out on the profits it would have earned from using its own property but for the injunction. *See* 282 N.W. at 792–93.

As the Restatement (Third) comments explain, "If there has been no transfer in consequence of the judgment that is later set aside, there is naturally no issue of restitution." Restatement (Third) § 18 cmt. *a*, at 244–45. Here, Modern Piping's partial occupancy breach of contract claim was not "taken" from Modern Piping by the temporary injunction enjoining arbitration proceedings with respect to entirely different claims.

III.

The district court erred in allowing Modern Piping to pursue the restitutionary damages it sought as part of its wrongful injunction claim. The judgment

is reversed to the extent it awards Modern Piping $12,784,177 as restitution for unjust enrichment. The judgment awarding Modern Piping $21,784.50 for its costs and fees in getting the temporary injunction dissolved is affirmed. The case is remanded for entry of an order consistent with this directive.

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**